**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 99-30253**

---

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**VERSUS**

**CLEVELAND R. RELIFORD; JOHNNY CLINTON;**
**JOHNNY WASHINGTON; ROBERT W. CLARK, JR.,**

**Defendants-Appellants.**

---

Appeals from the United States District Court
For the Western District of Louisiana

---

April 14, 2000

Before KING, DUHÉ, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

Defendants Robert Clark, Johnny Washington, Cleveland Reliford, and Johnny Clinton appeal following their conviction by jury trial on federal charges arising from their drug trafficking activities in and around the Shreveport, Louisiana area. We affirm in part, reverse in part, and remand for entry of a modified judgment.

**I.**

Clark, Washington, Reliford, and Clinton were charged, along with six other individuals, with conspiring to distribute crack

cocaine and with distributing crack cocaine. Shortly after trial began, the government presented a redacted form of the indictment. The redacted indictment named only defendants Clark, Washington, Reliford, and Clinton, and dismissed all charges against the other six defendants, some of whom had already pleaded guilty. Count 1 of the redacted indictment charged the four named defendants with conspiring to distribute 50 grams or more of crack cocaine between June 1994 and May 1997, in violation of 21 U.S.C. § 841(a)(1). The remaining counts of the eleven count indictment charged the actual distribution of crack cocaine on various dates.

Defendant Clark was charged, in addition to the conspiracy count, with a single count of attempting to distribute a quantity of crack cocaine on or about March 10, 1995 (count 10), in violation of 21 U.S.C. §§ 841(a)(1) & 846. Defendant Washington was charged, in addition to the conspiracy count, with several counts of distributing five grams or more of crack cocaine on September 28, 1994 (count 3), October 5, 1994 (count 4), October 21, 1994 (count 5), November 1, 1994 (count 6), January 24, 1995 (count 7), and January 31, 1995 (count 9), in violation of 21 U.S.C. § 841(a)(1). Defendant Washington was also charged with one count of distributing 50 grams or more of crack cocaine on January 27, 1995 (count 8), in violation of 21 U.S.C. § 841(a)(1), and with one count of attempting to distribute a quantity of crack cocaine on March 10, 1995 (count 10), in violation of 21 U.S.C. § 841(a)(1) & 846. Defendant Reliford was charged, in addition to the conspiracy count, with three counts of distributing five grams or

more of crack cocaine on September 22, 1994 (count 2), September 28, 1994 (count 3), and November 1, 1994 (count 6), in violation of 21 U.S.C. § 841(a)(1).  Defendant Clinton was charged, in addition to the conspiracy count, with one count of distributing a quantity of cocaine on May 27, 1997 (count 11), in violation of 21 U.S.C. § 841(a)(1).  In addition, each of the substantive distribution counts alleged in counts 2 through 11 contained an allegation that the defendants aided and abetted the commission of the charged offense, in violation of 18 U.S.C. § 2.

Trial began November 30, 1998.  On December 2, 1998, the jury returned guilty verdicts on all charged counts.  Shortly thereafter, the defendants were sentenced, and this appeal timely followed.

On appeal, each of the defendants presents a number of arguments intended to establish that there was insufficient evidence to support their convictions.  In addition, defendant Washington challenges certain rulings related to the admission of what he considers to be unduly prejudicial evidence.  Finally, defendants Clinton and Reliford dispute certain aspects of the district court's calculation of their guideline sentences.  Each issue will be addressed in turn.

## II.

Each of the defendants challenges the district court's denial of their timely filed motions for judgment of acquittal. We review the district court's denial of a criminal defendant's motion for

judgment of acquittal de novo. *See **United States v. Medina***, 161 F.3d 867, 872 (5th Cir. 1998), *cert. denied*, 119 S. Ct. 1344 (1999). Because such a motion is in effect a challenge to the sufficiency of evidence used to convict, we view the evidence, any inferences to be drawn from the evidence, and any required credibility determinations in a light most favorable to the guilty verdict. *See* FED. R. CRIM. P. 29(a); ***Medina***, 161 F.3d at 872. The jury's verdict must be affirmed if "a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." ***Id***.

All of the defendants were convicted on the single count alleging conspiracy to distribute crack cocaine in violation of § 841(a)(1) and § 846. Defendants Washington, Reliford, and Clinton were also convicted on additional substantive counts alleging distribution of crack cocaine on certain dates, in violation of § 841(a)(1). To prove a drug conspiracy under § 846, the government is required to establish: (1) "the existence of an agreement between two or more persons to violate the narcotics laws, (2) the defendant's knowledge of the agreement, and (3) the defendant's voluntary participation in the conspiracy." ***United States v. Gallardo-Trapero***, 185 F.3d 307, 316-17 (5th Cir. 1999), *cert. denied sub nom.*, ***Hernandez v. United States***, 120 S. Ct. 961 (2000). To prove drug distribution under § 841(a)(1), the government is required to establish that each defendant (1) "knowingly (2) distributed (3) the controlled substance" as alleged in the specific counts of the indictment. ***United States v.***

*Sotelo*, 97 F.3d 782, 789 (5th Cir. 1996). We have construed the term "distribute" to include a broad scope of conduct. *See United States v. Lechuga*, 888 F.2d 1472, 1478 (5th Cir. 1989). "For example, distribution may consist of acts perpetrated in furtherance of a transfer or sale, such as arranging or supervising the delivery." *Id*. (internal quotations omitted).

Defendants Clark and Washington were also charged with one count of attempting to distribute crack cocaine. To prove attempted drug distribution under § 841(a)(1) and § 846, the government must show that each defendant engaged in conduct constituting a substantial step toward completing the distribution offense. *See United States v. Armendariz-Mata*, 949 F.2d 151, 154 (5th Cir. 1991).

We note that the defendants' convictions on the substantive counts may also be supported with proof that they aided and abetted the substantive offense charged in the relevant count. To prove aiding and abetting, the government must show that the particular defendant became associated with, participated in, and in some way acted to further the distribution of crack cocaine alleged in the particular count of the indictment. *See United States v. Sorrells*, 145 F.3d 744, 753 (5th Cir. 1998); *United States v. Chavez*, 947 F.2d 742, 745-46 (5th Cir. 1991). "Association means that the defendant shared in the criminal intent of the principal." *Sorrells*, 145 F.3d at 753 (internal quotations omitted). "Participation means that the defendant engaged in some affirmative conduct designed to aid the venture." *Id*. "Although relevant,

mere presence and association are insufficient to sustain a conviction of aiding and abetting." *Id*.

Given the number of defendants and counts of conviction involved in this case, we will begin with a discussion of the record evidence, as it relates to each count of conviction, before proceeding to address each of the defendants' specific arguments.

## III.

### A. "The Hole"

Most of the drug transactions made the basis of the indictment in this case occurred on or near a short, dead-end block of Millen street in an isolated, semi-rural area of Shreveport, Louisiana. The location was popularly referred to as "the Hole." There are about eight or nine houses on the street, some in disrepair. Defendant Clinton or his family owned several of the houses. About four of the houses were used for the drug trafficking activities conducted by the defendants in this case.

### B. The Traffic Stop and the Ensuing Investigation

Shreveport police officer David Derrick testified about how and why police began investigating the defendants' involvement in drug trafficking activities. Officer Derrick testified that he stopped a car registered to defendant Clinton and driven by defendant Clark on June 13, 1994, for a traffic violation. Officer Derrick, who was familiar with Clark from prior contact with him, testified that Clark initially failed to stop the car, but eventually pulled into a gas station parking lot. As Officer

6

Derrick approached Clark's car, Clark's passenger, Sammy Sherman, exited the car holding a brown paper bag. Officer Derrick instructed Sherman to return to the car, but Sherman fled on foot. Defendant Clark used that opportunity to likewise flee the scene. Officer Derrick was able to apprehend Sherman and to recover the brown paper bag, which was determined to contain 18 ounces of cocaine. Officer Derrick was unable to apprehend defendant Clark.

Officer Derrick reported the incident to Shreveport police officer Mike Tong, who was assigned to a task force run jointly by the Drug Enforcement Agency (DEA) and the Shreveport police department. Officer Tong testified that he began an investigation into defendant Clark's drug trafficking activities as a result of Officer Derrick's report. Officer Tong was the primary agent responsible for the undercover investigation in this case.

Officer Tong recruited several individuals to work undercover in the course of the investigation. Shreveport police officer Gregory Washington made several purchases from persons selling drugs in the Hole. Officer Washington made controlled buys at the Hole on September 22, 1994, September 28, 1994, October 5, 1994, October 21, 1994, and November 1, 1994. After each of these purchases, Officer Washington would rendezvous with Officer Tong or another agent to deliver the crack cocaine purchased. The individual packages of crack cocaine purchased were introduced at trial and identified as the cocaine purchased on the dates alleged for each of the discrete purchases.

## C.   The September 22, 1994 Purchase - Count 2

Officer Washington testified about the September 22, 1994 purchase made the basis of the distribution charge against defendant Reliford in count 2 of the indictment. Officer Washington testified that he and a confidential informant drove to the Hole, and that the confidential informant introduced Officer Washington to defendant Reliford. Officer Washington then purchased "two quarter ounces," which converts to slightly more than 14 grams, directly from defendant Reliford. Officer Washington testified that he also observed defendant Clark standing outside at the site of the sale on September 22, 1994.

Officer Tong testified that the September 22, 1994 purchase was monitored via a transmitter carried by Officer Washington. During the course of the transaction, the seller identified himself. There is some conflict in the record concerning the exact words the seller used. Officer Washington testified that the seller identified himself with the full name "Cleveland Reliford." Officer Washington later testified that the seller used the name "Cleve." Officer Tong testified as to his recollection that the seller identified himself using the name "Big Cleve." There is likewise some confusion in the record concerning whether a tape recording was made of the purchase. Both Officer Washington and Officer Tong initially testified that such a tape would have been made. When Officer Tong testified, defense counsel objected, noting that no such tape had been produced during discovery. At that point, Officer Tong recanted, stating that he had been

8

confused and that such tapes were never made when a confidential informant was used in a joint investigation involving the City.

**D.    The September 28, 1994 Purchase - Count 3**

Officer Washington testified that he made a second purchase at the Hole on September 28, 1994.  This second purchase was made the basis of the distribution charge against defendants Reliford and Washington in count 3 of the indictment.   On this occasion, defendant Reliford introduced Officer Washington to defendant Washington, identifying defendant Washington as "Gold Brick." After some negotiation as to quantity and price, Officer Washington purchased half an ounce, or slightly in excess of 14 grams, directly from defendant Washington. Officer Washington testified that he knew defendant Reliford to be the person who facilitated the purchase of drugs on September 28, 1994.  Although he did not know defendant Washington's proper name at the time of the purchase, Officer Washington testified that he "dealt with" defendant Washington on that date.

**E.    The October 5, 1994 Purchase - Count 4**

Officer Washington testified that he made a third purchase at the Hole on October 5, 1994.  This third purchase was made the basis of the distribution charge against defendant Washington in count 4 of the indictment.  On this occasion, Officer Washington drove to the Hole with his confidential informant.   The confidential informant contacted defendant Washington, and both the confidential informant and Officer Washington were instructed to come inside one of the houses.  Once inside the house, defendant

Washington went into another room and returned with a PVC pipe filled with crack cocaine. Officer Washington then purchased an ounce of crack cocaine, or approximately 28 grams, directly from defendant Washington. While the transaction was proceeding, someone posted as a lookout came inside and reported his fear that someone was observing the transaction. Officer Washington testified that he believed the lookout had spotted one of the surveillance officers. Officer Washington completed the transaction as quickly as possible and was leaving the area when he was approached by defendant Clinton. Defendant Clinton told Officer Washington that Officer Washington would be "dealing with" defendant Clinton from now on. Although Officer Washington did not know defendant Washington's name at the time of the October 5, 1994 purchase, Officer Washington confirmed at trial that the October 5, 1994 purchase was made from defendant Washington.

**F.    The October 21, 1994 - Count 5**

Officer Washington testified that he made a fourth purchase at the Hole on October 21, 1994. This fourth purchase was made the basis of the distribution charge against defendant Washington in count 5 of the indictment. On this occasion, the confidential informant spoke privately with defendant Washington, while Officer Washington remained in the car. Afterwards, defendant Washington consulted defendant Clark, and then both defendant Washington and defendant Clark approached the door to one of the houses. Defendant Clark went in the house and defendant Washington remained posted outside on the porch. Next, defendant Washington told

Officer Washington to go wait in a different house next door. Officer Washington did so, and a few minutes later, defendant Washington came inside the second house with a package of crack cocaine. Officer Washington weighed the package and discovered that it was five grams short. Defendant Washington then left the house, and returned shortly thereafter with a package containing the additional crack cocaine. In addition to defendants Washington and Clark, Officer Washington also observed defendant Reliford with the others at the Hole on this occasion.

**G.    The November 1, 1994 Purchase - Count 6**

Officer Washington testified that he made a fifth purchase of crack cocaine at the Hole on November 1, 1994. This fifth purchase was made the basis of the distribution charge against defendants Reliford and Washington in count 6 of the indictment. On this occasion, Officer Washington went to the location with his confidential informant. Officer Washington remained in the car while the confidential informant went inside one of the houses to make contact. Shortly thereafter, defendants Reliford and Washington exited the house together. Defendant Reliford proceeded to the nearby wood line and returned with a package, which he handed to defendant Washington. Defendant Washington then went back inside the house, while defendant Reliford remained posted outside. A few minutes later, Officer Washington was asked to come inside the house, where he found that defendant Washington had laid crack cocaine out on the table. Officer Washington weighed out approximately 24 grams, for which he paid $1000.

**H.    The January 24, 1995 Purchase - Count 7**

Shreveport police officer Kevin Anderson also made undercover purchases at the Hole during the course of the investigation. Officer Tong testified that Officer Anderson made controlled purchases of crack cocaine on January 24, 1995, January 27, 1995, and January 31, 1995.  After each of the controlled purchases, Officer Anderson would rendezvous with Officer Tong or another agent to deliver the crack cocaine purchased.  The individual packages of crack cocaine purchased were introduced at trial and identified as the cocaine purchased on the dates alleged for each of the discrete purchases.  In addition, Officer Anderson made an aborted attempt to purchase crack cocaine at the Hole on March 10, 1995.  The March 10, 1995 attempt serves as the basis for the attempt count alleged against defendants Clark and Washington in count 10.

Officer Anderson testified that the January 24, 1995 purchase was made at the Hole.  This purchase was made the basis of the distribution charge against defendant Washington in count 7 of the indictment.  On that occasion, Officer Anderson and a confidential informant drove to the Hole.  Officer Anderson testified that as he approached he observed defendant Clark, whom he recognized from case file photographs, standing in the roadway.  Once there, defendant Washington asked Officer Anderson and the confidential informant to go into one of the houses in the Hole.  Once inside, Officer Anderson observed crack cocaine on a television table.

Defendant Washington confirmed to Officer Anderson that there was about two ounces of crack cocaine lying out on the table.

At some point, the confidential informant left the house to investigate a car that had approached the Hole at a high rate of speed. The confidential informant returned with the news that he overheard defendant Clinton tell defendant Clark that there were police in the area. Officer Anderson quickly concluded a transaction for approximately two ounces of crack cocaine and left.

I.   **The January 27, 1995 Purchase - Count 8**

Officer Anderson testified that he made a second controlled purchase on January 27, 1995. This second purchase was made the basis of the distribution charge against defendant Washington in count 8 of the indictment. On that date, Officer Anderson drove to the Hole with the confidential informant, intending to buy three ounces of crack cocaine. Office Anderson approached defendant Washington, who was standing outside one of the houses in the Hole. Defendant Washington informed Officer Anderson that there could not be any purchase until "Chickenman," who was known by Officer Anderson to be defendant Clark, returned to the Hole. Defendant Washington advised Officer Anderson to return in 15 minutes. When Officer Anderson and the confidential informant returned, defendant Clark was standing outside. Officer Anderson testified that defendant Clark seemed "kind of eerie," and that defendant Clark noticeably turned and walked away from Officer Anderson when they got out of the car. At that point, defendant Washington approached Officer Anderson and the confidential informant and told them that

there could not be any purchase made on that date, and they left the area.

Shortly thereafter, and in the presence of Officer Anderson, the confidential informant telephoned Henry McCullough (a.k.a. Nake). McCullough was an indicted co-conspirator in this case, but he pleaded guilty shortly before trial and then testified in exchange for the promise of the government's assistance in obtaining a reduced sentence. The confidential informant told McCullough that he was in the market to buy some crack cocaine. McCullough asked the confidential informant why he did not go directly to defendant Clark. The confidential informant told McCullough that defendant Clark did not seem to trust him. McCullough agreed to help.

McCullough then called defendant Clark and told him about the prospective deal. Defendant Clark was hesitant to do the deal, but eventually agreed after checking out a neutral place for the transaction, a service station where McCullough apparently worked or had some business. Defendant Clark sent the crack cocaine back to the service station with defendant Washington. When defendant Washington arrived, McCullough collected the crack cocaine from him in one car, delivered it to Officer Anderson in a second car, and then delivered the cash payment to defendant Washington in the first car. Officer Anderson corroborated McCullough's testimony that the confidential informant was able to set up a purchase from defendant Clark's organization using defendant Washington as the courier and co-conspirator McCullough as the go-between. While

**14**

McCullough was somewhat fuzzy on the exact date of the transaction, Officer Anderson clearly testified that the transaction occurred on January 27, 1995.

**J.    The January 31, 1995 Purchase - Count 9**

Officer Anderson testified that he made a third controlled purchase from defendant Clark's organization on January 31, 1995. This third purchase was made the basis of the distribution charge against defendant Washington in count 9 of the indictment.  On this occasion, Officer Anderson went to the Hole alone.  Once there, Officer Anderson approached defendant Washington and explained that he needed an ounce of crack cocaine.  Defendant Washington then retrieved crack cocaine from the glove box of a car parked on blocks.    Afterwards,  Officer  Anderson  accompanied  defendant Washington into one of the houses, where Officer Anderson weighed the crack cocaine and consummated the deal.  During the course of the  transaction,  Officer  Anderson  asked  defendant  Washington whether it would be okay for him to come to the Hole alone, without the  confidential  informant.   Defendant  Washington  told  Officer Anderson that defendant Clark would prefer that arrangement because that way defendant Clark would not have to pay the confidential informant a portion of the profits.

**K.    The March 10, 1995 Purchase - Count 10**

Officer Anderson testified that he attempted to make another purchase from defendant Clark's organization on March 10, 1995. This  attempted  purchase  was  made  the  basis  of  the  attempted distribution  charge  against  defendants  Clark  and  Washington  in

**15**

count 10 of the indictment. On this occasion, Officer Anderson complied with defendant Washington's advice by going to the Hole alone. Once there, Officer Anderson told his contact that he wanted to buy three ounces. Officer Anderson's contact had to get permission from defendant Clark before the deal could proceed. Officer Anderson testified that he saw defendant Clark tell the contact that the deal was possible, but that defendant Clark would have to go get more crack cocaine to fill Officer Anderson's order. Defendant Clark also gave his permission for the deal to proceed. Shortly thereafter, a fight broke out between unidentified people in the Hole. Surveillance agents monitoring the purchase via Officer Anderson's transmitter thought he was in trouble and rushed in to rescue him, which prevented the sale from proceeding further.

Officer Tong also testified concerning the attempted purchase on March 10, 1995. Officer Tong testified that there was aerial surveillance of the area, and that Officer Anderson was carrying a transmitter. Officer Tong corroborated Officer Anderson's testimony that the sale was proceeding normally when agents began hearing curse words and what sounded like a fight on the transmitter. Officer Tong therefore made the decision to send in reinforcements to protect Officer Anderson. As Tong entered the isolated, dead-end block, both he and Officer Anderson observed defendant Clark backing out of the Hole in a car at a high rate of speed. Officer Anderson testified that he also saw defendants Washington and Clinton at the scene on that date.

**16**

**L.    The May 27, 1995 Purchase - Count 11**

Officer Tong also used the assistance of a confidential informant, who is identified in the record as Aaron Perkins. Perkins lived in the neighborhood and was aware of the organization and the individuals involved in the organization. Perkins volunteered his services by contacting the police. Perkins told the police that drug sales were also occurring at defendant Clinton's house, which was less than one mile from the Hole. Perkins agreed to make a controlled purchase from defendant Clinton at his home.

Officer Tong testified that on May 27, 1997, he met with Perkins, frisked him for drugs, and then fronted him $200 of police department money for the purchase of drugs. Officer Tong and Perkins went to defendant Clinton's house at 2873 Freddie and Officer Tong watched Perkins enter Clinton's residence. Inside the house, defendant Perkins told defendant Clinton that he wanted to spend some money with Clinton. Clinton went to a back room and returned with a bag of cocaine, which he cut with a razor blade. Ten minutes after he went in, Perkins exited defendant Clinton's house and returned to Officer Tong's car.

Perkins was paid $150 by the DEA for making the purchase from defendant Clinton. Perkins volunteered his assistance and was not under threat of prosecution for drug trafficking activities when he participated in the May 27, 1997 purchase.

Defense counsel was permitted to impeach Perkins' testimony with Officer Tong's report on the purchase. Officer Tong's report

recounted that Perkins told Tong that defendant Clinton had secured the crack cocaine from the backyard, rather than a back room. Perkins stuck with his story that defendant Clinton procured the crack cocaine from a back room. Defense counsel tried to resurrect the inconsistency again, impeaching Tong's testimony that Perkins told him that defendant Clinton got the crack cocaine from a back room with the report stating that Clinton retrieved the cocaine from the backyard. Officer Tong responded that he observed the house and that no one came outside or left the house while Perkins was inside. Thus, notwithstanding any contrary indication in the report, it was highly unlikely in Officer Tong's view that anyone could have obtained anything from the backyard. Defense counsel was also permitted to attack Perkins' credibility by establishing that Perkins had functioned as a paid informant for the DEA before, and that he had prior convictions for aggravated battery.

## M. Additional Evidence Relating to the Conspiracy

The government also offered the testimony of two indicted co-conspirators and two customers who bought drugs from defendant Clark's organization.

### A. Co-conspirator McCullough

Co-Conspirator McCullough told the jury that his relationship with defendant Clark began in 1988 or 1989, when defendant Clark asked McCullough, who had a reputation for avoiding robbery in the course of drug trafficking, to provide protection for Clark's drug trafficking activities.

Co-conspirator McCullough testified that he pleaded guilty to the conspiracy charge alleged in count 1, but that he volunteered to assist the government before he decided to plead guilty. With regard to the conspiracy alleged in count 1, McCullough testified that he knew each of the defendants and that they were all involved in the conspiracy alleged in count 1 of the indictment. McCullough testified that defendant Clark was the source of the crack cocaine sold by the organization. McCullough testified that Clark's organization was based at the Hole, that defendant Clinton or his family owned some of the houses there, that defendant Clark maintained a trailer there, and that McCullough himself lived and worked there protecting defendant Clark's drug operation.

Co-conspirator McCullough testified that defendant Clark provided guns, typically either a .357 magnum or a 9 millimeter, that McCullough carried as part of his security work for the drug trafficking organization. Although McCullough never used the gun, he testified that he would have used it if someone had tried to rob the organization. McCullough was compensated for his security work with cost-free illegal drugs rather than money; he testified that needed the job to support his $400 or $500 per day drug habit.

McCullough testified that the police had difficulty stopping the drug trafficking operations in the Hole, even though they knew or strongly suspected that it was occurring. This was because the semi-rural area was difficult to observe and because the defendants would just move the operation to another location when the police applied pressure and then return when the police retreated. Part

of the plan was to have lookouts outside monitoring the area at all times, and participants in the organization had ways to determine when an undercover officer was in the area.

McCullough testified that when the conspiracy ended, defendant Clark's organization was selling about 40 grams of crack cocaine per week. The layout and relative isolation of the Hole area made traffic and parking serious issues that the operation had to deal with. McCullough testified that he had observed defendant Reliford directing traffic in and out of the Hole for drug purchases some time after 1993. Aside from that evidence, McCullough stated that he did not deal drugs with defendant Reliford.

McCullough identified the defendants in court and his testimony tied their proper names to the street names used in the conspiracy. Defendant Clark was identified as "Chickenman" or "Chick," the leader of the conspiracy. Defendant Clinton was identified as "Whopper." Defendant Washington was identified as "Gold Brick," a distributor in the organization.[1] McCullough identified defendant Reliford as "Cleve." After this testimony, the prosecutor asked that the record reflect McCullough's identification of the defendants. Defendant Washington's counsel raised, but then withdrew, an objection to the prosecutor's request.

Defense counsel was permitted to call McCullough's credibility

---

[1] Although McCullough testified that he had known Gold Brick since childhood, he did not know his proper name. He was, however, able to point him out, thereby identifying him as Gold Brick in court.

into question by exploring any promise of favorable treatment, by establishing that he had prior drug convictions, and by eliciting testimony that he had been in drug rehab and relapsed several times.

### B.    Co-conspirator Sellers

Co-conspirator Darryl Sellers pleaded guilty to the conspiracy alleged in count 1 prior to trial, and then agreed to assist the government in exchange for the government's agreement to seek a favorable sentence in his case.  Sellers testified that he was involved in defendant Clark's drug trafficking organization during the period defined in the indictment.  Sellers testified that defendants Clark, Clinton, and Washington were involved in those activities with him, and corroborated testimony that defendant Washington used the name Gold Brick in the conspiracy.[2]

Sellers also provided testimony about the roles assumed by the various defendants in the conspiracy.  Sellers testified that Clark ran the drug trafficking organization.  Sellers testified that the organization ran smoothly and that, although he was involved in the conspiracy, he was not considered "qualified" to formally join the operation.  With respect to defendant Clinton, Sellers emphasized that Clinton likewise played an important role in the organization. For example, Sellers testified that he had observed defendant Clark and defendant Clinton pooling their money for drugs.  Sellers testified that defendant Washington was a distributor like himself

---

[2]    Sellers did not identify defendant Reliford as someone who was involved in the conspiracy to which he pleaded guilty.

21

and that he obtained the drugs from either defendant Clark or defendant Clinton. Sellers specifically testified that he obtained 7 gram packages of crack cocaine drugs from defendant Clark on two or three occasions in 1994, on one occasion in 1995, and on another occasion in 1996. Sellers further testified that he obtained an "eight-ball" from defendant Clark in 1997. Finally, Sellers testified that he obtained a half-ounce package of crack cocaine from defendant Clinton in 1995.

Defense counsel was permitted to call Sellers' testimony into question by establishing that Sellers is a long-time gang member, and that he had a prior conviction for felony theft and prior drug convictions. By doing so, the defense was able to dramatically highlight both Sellers' criminal history and the significant value to Sellers of the government's promise to press for a reduced sentence in his case.

### C.    Customers Alice June and Demarcus June

Alice and Demarcus June testified as customers of the Clark drug trafficking organization. Neither of the Junes was indicted in the instant case.

Alice June testified that she had known defendant Clark since he was a little boy, and that she bought crack cocaine from him. Specifically, Alice June testified that she purchased 4.5 ounce quantities from defendant Clark on seven or eight occasions during the period defined by the conspiracy charged in count 1 of the indictment.

On cross-examination, defense counsel was permitted to develop

**22**

facts bearing on Alice June's credibility, including her prior drug convictions, a prior conviction for shoplifting, and the fact that she received a significantly reduced sentence in an unrelated prosecution after she agreed to cooperate with the government. The defense was also permitted to explore the fact that the prosecution had promised to request some further reduction of Alice June's already imposed sentence pursuant to Federal Rule of Criminal Procedure 35 if she cooperated in the instant case.

Demarcus June testified that he knew defendant Clark throughout the period defined by count 1 of the indictment and that he purchased crack cocaine from defendant Clark on six or seven occasions during that time period. Demarcus June testified that he typically purchased a half-ounce (approximately 14 grams) or a full ounce (approximately 28 grams) at a time. Demarcus June testified that he knew defendant Reliford, but that defendant Clark was the only person he bought drugs from in the Hole.

On cross-examination, defense counsel was permitted to develop facts bearing on Demarcus June's credibility. For example, defense counsel elicited testimony establishing that he had received a sentence reduction in an unrelated case for cooperating with the government, and that the government had promised to request some further reduction of his already imposed sentence pursuant to Federal Rule of Criminal Procedure 35 if he cooperated in the instant case.

### III. SUFFICIENCY ARGUMENTS

Having set forth the relevant evidence, we now turn to

consideration of the defendants' specific arguments that the government failed to meet its burden of proof.

## A.    Defendant Clark

Defendant Clark challenges the sufficiency of the evidence to establish his criminal liability on the conspiracy count, and on the charge in count 10 that he attempted to distribute crack cocaine on March 10, 1995. Defendant Clark raises a general challenge to the sufficiency of the evidence used to convict him as well as two specific sufficiency arguments. First, Clark argues that there is insufficient evidence to prove that he was ever in actual or constructive possession of crack cocaine. We disagree, both with the factual premise that there is no such evidence in the record, and with the legal premise that the absence of such evidence would require the reversal of his convictions. The record is rife with strong circumstantial evidence establishing Clark's important leadership role in drug trafficking activities involving sufficiently large quantities of crack cocaine. More importantly, Clark was charged and convicted on counts alleging conspiracy to distribute (count 1) and actual distribution (count 10) of crack cocaine. Clark was not charged with and does not stand convicted on the alternative statutory theory that he possessed crack cocaine with intent to distribute the drug. Possession is not an essential element of a charge based upon actual distribution of the drug, rather than possession with intent to distribute. See Sotelo, 97 F.3d at 789 (articulating the essential elements of a distribution offense).

**24**

Defendant Clark next argues that the government's evidence that he was involved in the actual distribution of cocaine must be discounted because it came exclusively from the testimony of convicted felons who were promised the possibility of favorable sentences in exchange for their cooperation at Clark's trial. Once again, we disagree with both the factual premise and the legal conclusion offered in support of this argument. Clark's conviction on the substantive count alleging attempted distribution (count 10) depends primarily upon the testimony of Officer Anderson, whom defendant Clark concedes is a credible witness. Clark's conviction on the conspiracy count is likewise supported by the testimony of law enforcement officers Tong, Washington, and Anderson, all of whom defendant Clark concedes are credible witnesses worthy of belief by the jury. More fundamentally, even if Clark's conspiracy conviction were supported solely by the testimony of the cast of co-conspirators, paid informants, and customers who appeared in this case, we would not find reversible error. As an initial matter, the uncorroborated testimony of a co-conspirator, "even one who has chosen to cooperate with the government in exchange for non-prosecution or leniency, may be constitutionally sufficient evidence to convict." **United States v. Medina**, 161 F.3d 867, 872-73 (5th Cir. 1998) (internal quotations omitted), *cert. denied*, 119 S. Ct. 1344 (1999). But Clark does not even argue that such evidence is insubstantial, but that it is unworthy of belief. This argument is unavailing. "It is well-settled that credibility determinations are the sole province of the jury." **United States**

*v. Dixon*, 132 F.3d 192, 199 (5th Cir. 1997) (internal alterations and quotations omitted), *cert. denied*, 118 S. Ct. 158 (1998). The district court gave explicit and lengthy instructions cautioning the jury that they should carefully consider the character of the witnesses and the nature of their interest in the case when deciding whether to credit particular testimony. Clark's counsel was permitted a great deal of latitude when cross-examining the government's witnesses on issues of potential bias or interest, and we see no reason in this case to second-guess the jury's credibility determinations.

Having reviewed the record evidence, we are persuaded that there is ample record evidence establishing each of the essential elements required to support defendant Clark's convictions for conspiracy to distribute crack cocaine (count 1) and attempted distribution of crack cocaine (count 10). We therefore reject defendant Clark's argument that his convictions must be reversed because they are not supported by sufficient evidence, and affirm the district court's judgment of conviction on both counts.

## B.    Defendant Clinton

Defendant Clinton challenges the sufficiency of the evidence to support his convictions on the conspiracy count, and on the charge in count 11 that he distributed a quantity of cocaine on May 27, 1995. Clinton complains that his conviction on the conspiracy count depends entirely upon the incredible testimony of an indicted but pleading coconspirator, Darryl Sellers. Similarly, Clinton complains that his conviction on count 11 depends entirely upon the

incredible testimony of a paid confidential informant, Aaron Perkins. Clinton makes, not only the unavailing argument that the evidence from these witnesses was incredible, but also the more viable argument that it was insubstantial. *See* **Medina**, 161 F.3d at 872-73; **Dixon**, 132 F.3d at 199.

The problem with Clinton's argument is that neither of defendant Clinton's convictions depend solely upon the uncorroborated testimony of co-conspirator Sellers or informant Perkins. With respect to the conspiracy count, the car driven by defendant Clark when Officer Derrick made the traffic stop that led to the investigation in this case belonged to Clinton. Several of the houses on the block comprising the Hole belonged to either Clinton or his family, suggesting that he was strongly tied to the distinctive location used primarily for drug trafficking activities. Officer Washington testified that Clinton approached Officer Washington as he was leaving the Hole on October 5, 1994, telling Officer Washington that he would be "dealing with" Clinton from now on. Officer Anderson testified that Clinton warned defendant Clark about police in the area of the Hole while a drug transaction with an undercover officer was in progress on January 24, 1995. Finally, Officer Anderson testified that defendant Clinton was present when Officer Anderson made the foiled attempt to purchase three ounces on March 10, 1995.

Co-conspirator Sellers added to this body of evidence by providing details about Clinton's involvement and his role in the conspiracy. Many of those details were corroborated by the

**27**

testimony of co-conspirator McCullough.  Clinton is correct that Sellers was the exclusive source for a few details relating to Clinton's role rather than whether he was involved in the conspiracy.  Those facts, however, were relevant primarily for sentencing purposes and were not required to sustain the jury's determination of guilt.

With respect to the distribution count (count 11), paid informant Perkins' testimony is corroborated in many particulars by that of Officer Tong, who frisked Perkins before the buy, transported Perkins to the buy, observed the house during the course of the buy, and then took possession of the crack cocaine immediately after Perkins exited defendant Clinton's house.  The reasonable inference that Clinton distributed cocaine on that occasion could be drawn from Officer Tong's testimony alone, but is made stronger by Perkins' testimony, which merely provides additional details about what happened inside defendant Clinton's house on May 27, 1995.  For the foregoing reasons, Perkins' testimony is neither uncorroborated nor insubstantial.

Having reviewed the record evidence, we are persuaded that there is ample record evidence establishing each of the essential elements required to support defendant Clinton's convictions for conspiracy to distribute crack cocaine (count 1) and for distributing a quantity of cocaine on May 27, 1997 (count 11).  We therefore reject defendant Clark's argument that his convictions must be reversed because they are not supported by sufficient evidence, and affirm the district court's judgment of conviction on

**28**

both counts.

**C.   Defendant Reliford**

Defendant Reliford challenges the sufficiency of the evidence to support his convictions on the conspiracy count (count 1), and on three counts alleging that he distributed crack cocaine on September 22, 1994 (count 2), September 28 (count 3), and November 1, 1994 (count 6).  Defendant Reliford makes separate arguments concerning the conspiracy count and the three substantive distribution counts.  With respect to the distribution counts, Reliford argues that the government failed to prove identity; that is, that he is the person who committed the acts alleged in the indictment.  With respect to the conspiracy count, Reliford maintains that the evidence was insufficient to establish his knowing and voluntary participation in the charged conspiracy. Each of these arguments will be considered in turn.

**1.   Distribution Counts**

Defendant Reliford argues that his convictions for distribution of crack cocaine on September 22, 1994 (count 2), September 28 (count 3), and November 1, 1994 (count 6), must be reversed because the government failed to prove that he was the person who sold Officer Washington crack cocaine on September 22, 1994, facilitated the September 27, 1994 undercover purchase by introducing Officer Washington to defendant Washington, and participated in the November 1, 1994 purchase by procuring drugs from a location near the wood line.  Defendant Reliford notes that

**29**

the prosecutor never led Officer Washington through a definitive or distinct in-court identification of Reliford as the man from whom Officer Washington purchased drugs on September 22, 1994. Defendant Reliford then maintains that Officer Washington's pretrial identification of defendant Reliford from a photo array may not be used to support his conviction because the facts and circumstances surrounding the identification rendered the identification inherently unreliable.

We disagree. Officer Washington was twice asked at trial whether he knew defendant Cleveland Reliford. Officer Washington testified that he did know defendant Reliford and that defendant Reliford was the person who sold him drugs on September 22, 1994, who facilitated the September 28, 1994 purchase of crack cocaine by introducing Officer Washington to defendant Washington, and who procured cocaine from the wood line for the November 1, 1994 purchase charged in count 6. Thus, we disagree with defendant Reliford's contention that Officer Washington never identified defendant Reliford at trial.

Officer Washington's testimony revealed that his identification of defendant Reliford was based upon the name given by Reliford to Officer Washington during the September 22, 1994 drug purchase, the confirmation of Reliford's identity received from Officer Washington's confidential informant, and a pretrial identification of Reliford by Officer Washington from a six photo array prepared shortly after the September 22, 1994 purchase by another officer.

30

Defendant Reliford attacks only the reliability of and the jury's reliance upon the pretrial identification. Defendant Reliford does not argue that the pretrial identification was impermissibly suggestive. Rather, defendant Reliford's brief argument on this point, which is completely devoid of relevant citation, suggests that certain inconsistencies in the testimony concerning the photo array either render the pretrial identification unreliable or otherwise make the jury's reliance upon that evidence unreasonable. Specifically, defendant Reliford notes that Officer Washington and Officer Tong gave inconsistent testimony concerning how the defendant identified himself during the September 22, 1994 undercover purchase. Officer Washington testified that defendant Reliford identified himself as Cleveland Reliford, while Officer Tong testified that defendant Reliford identified himself as Big Cleve. Defendant Reliford notes that, notwithstanding this testimony that the defendant identified himself during the September 22, 1994 undercover purchase, Officer Washington left defendant Reliford's name out of his report pending positive identification at a subsequent pretrial photo array. Finally, defendant Reliford notes that the police reports and the officer's testimony at trial generated some confusion about exactly when the photo array was shown to Officer Washington.

These inconsistencies are either immaterial or were adequately explained by the testimony at trial. Although the police reports mention the photo array on several different dates, those inconsistencies were adequately explained by the testifying

**31**

witnesses. Officer Washington explained that the subject of a photo array was raised immediately after the first sale. Consistently, Officer Tong's report first mentions the photo array on September 23, 1994, the day after the first drug purchase. Although both Officer Tong and Officer Washington demonstrated some initial confusion about whether the photo array was shown to Officer Washington on September 27, 1994 or September 29, 1994, Officer Washington later confirmed that he conclusively identified defendant Reliford on September 29, 1994, the date indicated next to his signature on the actual array, which was admitted as an exhibit at trial. Further testimony clarified that the array might have been requested and prepared on separate dates, and then shown to Officer Washington on a third date. Officer Washington also explained that, notwithstanding defendant Reliford's use of either his proper name or a nickname during the September 22, 1994 purchase, he was advised to omit the name of the suspect from his September 22, 1994 report until the array could be conducted. Finally, without regard to how the defendant identified himself during the September 22, 1994 drug purchase, he was identified by both his proper name, Cleveland Reliford, and his nickname, Cleve or Big Cleve, at trial. Aside from these minor inconsistencies in the trial testimony, defendant Reliford does not identify any facts that tend to undermine the credibility of Officer Washington's testimony or the accuracy or validity of his pretrial identification of defendant Reliford.

We note that, while framed in terms of reliability, defendant

**32**

Reliford's specific arguments actually relate to the credibility of Officer Washington's testimony rather than the reliability of his identification. However, even if we were persuaded that the inconsistencies identified by Reliford have any import with respect to the reliability of Officer Washington's identification, we would still find no error. Whether there has been any infringement upon a criminal defendant's evidentiary interest in reliable identification is measured by a totality of the relevant circumstances. *See Manson v. Brathwaite*, 97 S. Ct. 2243, 2252 (1977); *United States v. Rogers*, 126 F.3d 655, 659 (5th Cir. 1997); *United States v. Sanchez*, 988 F.2d 1384, 1389 (5th Cir. 1993). A pretrial identification need not be excluded from the jury's consideration unless there is a "very substantial likelihood of irreparable misidentification." *Manson*, 97 S. Ct. at 2254; *see also Rogers*, 126 F.3d at 658; *Sanchez*, 988 F.2d at 1389. "Short of that point, such evidence is for the jury to weigh" because "[j]uries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Id*.

Defendant Reliford has not presented any facts tending to undermine the accuracy of Officer Washington's identification. The factual inconsistencies he does offer were properly resolved by the jury. Moreover, the totality of the evidence at trial adequately supports the jury's determination that Reliford is the person who committed the charged offenses. We therefore reject defendant Reliford's challenge to the sufficiency of the evidence to support

**33**

his convictions for distribution of crack cocaine on September 22, 1994 (count 2), September 28, 1994 (count 3), and November 1, 1994 (count 6).

### 2.   Conspiracy Count

Defendant Reliford argues that his conspiracy conviction must be reversed because the government presented insufficient evidence to establish that he knowingly and voluntarily participated in the charged conspiracy.   Reliford complains that the government evidence establishes nothing more than that he sold drugs at the same location used by the conspirators on September 22, 1994, that he facilitated a second sale on September 28, 1994, and that he participated in a third sale on November 1, 1994.   Reliford maintains that this evidence is insufficient to establish his knowing participation in this conspiracy.  Alternatively, Reliford maintains that his conviction cannot be sustained because the evidence is insufficient to establish his continued involvement after the November 1, 1994 purchase.

We disagree.   Reliford's active participation in three transactions plus the additional evidence demonstrating his involvement in the conspiracy is sufficient in this case to support a reasonable inference of knowing and voluntary participation. Moreover, the jury could reasonably infer that defendant Reliford continued to be involved in the conspiracy after November 1, 1994, absent evidence that Reliford acted in manner that was inconsistent with the object of the conspiracy and did so in a manner that was reasonably calculated to reach the conspirators. *See*, *e.g.*, ***United***

*States v. Mann*, 161 F.3d 840, 859-60 (5th Cir. 1998); *see also*
*United States v. Puig-Infante*, 19 F.3d 929, 945 (5th Cir. 1994)
("Ordinarily, a defendant is presumed to continue involvement in a
conspiracy unless that defendant makes a substantial affirmative
showing of withdrawal, abandonment, or defeat of the conspiratorial
purpose.") (internal quotations omitted).

We conclude that the evidence was sufficient to support
defendant Reliford's conspiracy conviction and, therefore, affirm
the district court's judgment of conviction as to that count.

D.   **Defendant Washington**

Defendant Washington challenges the sufficiency of the
evidence to support his convictions on the conspiracy count, six
counts of distributing five grams or more of crack cocaine on
September 28, 1994 (count 3), October 5, 1994 (count 4), October
21, 1994 (count 5), November 1, 1994 (count 6), January 24, 1995
(count 7), and January 31, 1995 (count 9), one count of
distributing 50 grams or more of crack cocaine on January 27, 1995
(count 8), and one count of attempting to distribute a quantity of
crack cocaine on March 10, 1995 (count 10).  Defendant Washington
raises the general point that the district court erred by refusing
to grant his motion for judgment of acquittal and the specific
argument that the government failed to prove identity, i.e. that he
is the person who committed the acts alleged in the indictment.
Defendant Washington's argument in this regard is closely tied to
the way in which law enforcement officials positively identified
him as the perpetrator prior to trial.

The testimony at trial established that neither Officer Washington nor Officer Anderson knew defendant Washington's proper name during much of the undercover investigation. Instead, both officers knew the person they later identified as defendant Washington only by his nickname, Gold Brick. At some point, a confidential informant identified Gold Brick as the defendant, Johnny Washington. Upon receiving this information, Officer Tong obtained a photo of defendant Washington from the Shreveport Police department and placed the photo in the case file.

At trial, the government did not ask either Officer Washington or Officer Anderson to formally identify defendant Washington as the person from whom they purchased drugs in the course of the undercover investigation. The officers' testimony nonetheless eliminated any doubt about their certainty that defendant Washington was the same person as the Gold Brick from whom they purchased drugs during the undercover investigation. Officer Washington testified that Gold Brick was defendant Washington's street name or alias. Moreover, Officer Washington testified that he did subsequently identify defendant Washington as Gold Brick, although that identification was not made by way of a formal pre-trial photographic line-up or in written reports. Officer Anderson testified that he was "positive" of his identification of defendant Washington as Gold Brick, and that defendant Washington was the same man that he purchased drugs from on several occasions. Officer Anderson also testified that he had previously identified defendant Washington in a pretrial photo line-up. Although neither

Officer Washington's nor Officer Anderson's testimony on the subject is very clear, Officer Tong's testimony suggests that their pretrial identification of defendant Washington was based upon information received from a confidential informant and their identification of defendant Washington from the photo placed in the case file by Officer Tong.

Defendant Washington argues both that the pretrial identification procedure was impermissibly suggestive and that the subsequent identification was unreliable. Defendant Washington contends that his due process rights have been violated because the facts and circumstances in this case create a substantial risk of irreparable misidentification. *See* **United States v. Rogers**, 126 F.3d 655, 658 (5th Cir. 1997) ("The Due Process Clause protects accused individuals from the use against them of evidence derived from unreliable identifications that resulted from impermissibly suggestive procedures."). We scrutinize such claims using a two-part test. First, we ask whether the identification procedure was impermissibly suggestive. **Id**. Second, we ask whether, in light of the totality of the relevant circumstances, the procedure posed a "very substantial likelihood of irreparable misidentification." **Id**. If the answer to both questions is yes, then the identification is not admissible and should have been excluded from the jury's consideration. *See* **Rogers**, 126 F.3d at 658.

The lynchpin of the balancing inquiry is reliability, with an attendant focus upon fairness. **Manson**, 97 S. Ct. at 2253; **Rogers**, 126 F.3d at 658; **Sanchez**, 988 F.2d at 1384. Factors that may be

considered when making this determination include: (1) the opportunity of the witness to observe the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of the witness' prior description; 4) the level of certainty demonstrated at the identification; and 5) the time between the crime and the identification. *See* **Manson**, 97 S. Ct. at 2253; **Rogers**, 126 F.3d at 658; **Sanchez**, 988 F.2d at 1389. These factors are to be weighed against the "corrupting effect of the suggestive identification itself." **Manson**, 97 S. Ct. at 2253; **Rogers**, 126 F.3d at 658.

Defendant Washington argues, and this Court has recognized that an identification premised upon the presentation of a single photograph may be highly suggestive. *See* **Rogers**, 126 F.3d at 658; *see also* **Manson**, 97 S. Ct. at 2254. Thus, at least in some contexts, the potential for a corrupting influence when a pretrial investigation is premised upon a single photograph may be high. We note, however, that this is not a case in which a vulnerable victim outside of law enforcement was presented with a single photograph by law enforcement authorities who, by presenting only one photograph, suggested that the pictured individual was the perpetrator. To the contrary, these trained law enforcement officers dealt with defendant Washington face-to-face. *See* **Manson**, 97 S. Ct. at 2253; **Sanchez**, 988 F.2d at 1389-90. In that sense, the photograph was actually used to confirm defendant Washington's *proper name* rather than his *identity* as a perpetrator. We need not, however, decide whether the procedure utilized in this case

**38**

was impermissibly suggestive because assuming arguendo that it was, there can be no reversible error unless the totality of the relevant circumstances create a "very substantial likelihood of irreparable misidentification." *Manson*, 97 S. Ct. at 2254; *see also Rogers*, 126 F.3d at 658; *Sanchez*, 988 F.2d at 1389.

There is no such likelihood of misidentification in this case. Officer Washington's and Officer Anderson's identification of defendant Washington from the photograph in the case file occurred near the end or at the end of the undercover investigation and after defendant Washington was involved in multiple undercover purchases. Both officers had ample opportunities to observe defendant Washington, and there is no indication that their view of him during those transactions was in any way obstructed or compromised. *See Manson*, 97 S. Ct. at 2253; *Sanchez*, 988 F.2d at 1389-90. As police officers engaged in an undercover investigation, both officers would have anticipated being called upon to identify the persons involved in the drug trafficking activities. *See Manson*, 97 S. Ct. at 2254; *Sanchez*, 988 F.2d at 1390. Thus, both officers would have been exercising a high degree of attention. *See Sanchez*, 988 F.2d at 1390. While there is no evidence that either officer reported a verbal description of defendant Washington, a.k.a. Gold Brick, to Officer Tong or other case agents, both officers' trial testimony tended to negate any doubt about defendant Washington's identity as Gold Brick. *See Manson*, 97 S. Ct. at 2253. Finally, the officers' identification of defendant Washington occurred shortly after police were able to

discern his true identity. For Officer Washington, this was after the last in a series of purchases involving defendant Washington; for Officer Anderson, this was shortly after his first purchase involving defendant Washington and while his investigation was continuing.

Defendant Washington attempts to establish the inherently unreliable nature of the officers' pretrial identifications by pointing to a police report and an evidence bag prepared after one of the undercover purchases. At that time Gold Brick's proper name was unknown, but police had reason to believe that Gold Brick's real name might be "Sidney Young." That possibility was recorded in the police report and on the evidence bag. Defendant Washington contends that this evidence suggests that the officers' identifications might be in error. We disagree. The police report and evidence bag merely reflected the task force's best understanding of the identity of Gold Brick at that time. There is absolutely nothing in the record to suggest that any such Sidney Young is in fact a real person or that defendant Washington was incorrectly identified by the undercover officers. Moreover, defense counsel was given ample opportunity to explore the import of the police report and evidence bag at trial, and this is precisely the type of conflict that the jury is competent to resolve. *See Manson*, 97 S. Ct at 2254; *Sanchez*, 988 F.2d at 1391

Identity can be proven through inference and circumstantial evidence. *See United States v. Guerrero*, 169 F.3d 933, 941 (5th Cir. 1999). When supported by the officers' unequivocal testimony

at trial, and the corroborating testimony of other witnesses, we are persuaded that there is not in this case a very substantial likelihood that both officers' pretrial identification of defendant Washington was in error. For that reason, there can be no error predicated upon defendant Washington's contention that the identifications were unreliable, and we reject defendant Washington's argument that his convictions must be reversed because the government failed to establish his identity.

We are persuaded, however, that the government's evidence was insufficient to support defendant Washington's conviction on the charge in count 10 that he attempted to distribute crack cocaine on March 10, 1995. The record evidence relating to that charge establishes nothing more than that Officer Anderson saw defendant Washington at the Hole on that date. There is nothing tying defendant Washington to the attempted transaction made the basis of that charge. Accordingly, defendant Washington's judgment of conviction and sentence on that count must be vacated, and the cause remanded for entry of a modified judgment.

### III. EVIDENTIARY POINTS

Defendant Washington argues that his conviction must be reversed because the district court denied his motion for mistrial after Officer Tong inadvertently referred to a photograph taken in the course of defendant Washington's prior arrest. The objectionable reference occurred in the following context. On direct examination, the prosecutor established that Officer Tong

**41**

had identified all of the defendants as being involved in the charged offenses. On cross-examination, defendant Washington's counsel questioned Officer Tong at length about exactly how defendant Washington was identified as being the person using the street name of Gold Brick. On re-direct examination, the prosecutor sought to clarify any misunderstanding about the identification, by asking Officer Tong to clarify how Officer Washington confirmed defendant Washington's identity. Officer Tong responded as follows:

> Mr. Washington was always identified through the undercover purchases as Gold Brick. It took several days for us, or took us several months for us to positively identify him by name, which was Johnny Washington. Upon identifying him as Johnny Washington, I obtained a Shreveport Police photograph of a prior arrest and placed it in . . .

At that point in the testimony, defendant Washington's counsel made an objection, which was sustained by the district court. The district court further instructed the jury at that time that they were to disregard the last sentence of Officer Tong's testimony, and specifically, where or how the photograph was obtained by the police. Washington's counsel then noted that a further objection and request on defendant Washington's behalf needed to be raised, but could be handled outside the presence of the jury. Later, outside the presence of the jury, defendant Washington moved for a mistrial. The district court denied the motion, noting that there was insufficient prejudice rising from the brief remark to justify a mistrial.

We review the district court's denial of a motion for mistrial

for an abuse of discretion. *See **United States v. Millsaps***, 157 F.3d 989, 993 (5th Cir. 1998). "If the motion for mistrial involves the presentation of prejudicial testimony before a jury, a new trial is required only if there is a significant possibility that the prejudicial evidence had a substantial impact upon the jury verdict, viewed in light of the entire record." ***United States v. Paul***, 142 F.3d 836, 844 (5th Cir.), *cert. denied*, 119 S. Ct. 271 (1998). A prejudicial remark may be rendered harmless by curative instructions to the jury. *See **United States v. Nguyen***, 28 F.3d 477, 483 (5th Cir. 1994). Moreover, this Court gives great weight to the district court's assessment of the prejudicial effect of an objectionable remark. ***Id***.

Defendant Washington acknowledges that a curative instruction is often sufficient to avoid undue prejudice, but argues that the curative instruction was not sufficient in this case because the absence of competent evidence identifying defendant Washington as the person who committed the acts alleged in the indictment created a "significant possibility" that the jury would be unable to disregard the reference to Washington's prior arrest. The Government counters that Officer Tong's reference was fleeting and unrelated to the substantive testimony being offered. *See **United States v. Sotelo***, 97 F.3d 782, 798 (5th Cir. 1996) (characterizing such comments as "stray" and finding any error harmless). The government also relies upon the curative instruction and the overwhelming nature of the evidence against defendant Washington for the proposition that the trial court did not abuse its

**43**

discretion.

Having concluded an exhaustive review of the record, we affirm the district court's denial of defendant Washington's motion for mistrial. Officer Tong's stray reference to defendant Washington's prior arrest was exceedingly brief and was completely unrelated to the substance of his identification testimony. The government did not impermissibly refer to or explicitly or implicitly make any objectionable use of the comment later in the trial. In addition, the district court's straightforward curative instruction was adequate to address any potential prejudice arising from the fleeting remark. As the district court explicitly recognized in its comments to counsel outside the presence of the jury, any further comment would only have merely exaggerated the significance of what was otherwise a relatively innocuous and brief remark. Finally, as developed *supra*, we do not agree with defendant Washington's premise that the record is somehow deficient on the issue of his identity. The government produced ample evidence of defendant Washington's identity.

Defendant Washington also contends that his conviction must be reversed because the district court permitted Henry McCullough, a pleading co-conspirator, to testify that his guilty plea to count 1 of the indictment included his admission that he "sold drugs with" defendant Washington and other defendants. Defendant Washington objected to this testimony as being inadmissible because it was not tied to the time frame of the conspiracy or the offenses alleged in this case, and as being beyond the permissible scope of

**44**

redirect. Defendant Washington presses those same arguments on appeal.

We review the district court's decision to admit evidence for abuse of discretion. *See **United States v. Townsend***, 31 F.3d 262, 268 (5th Cir. 1994). Even if an abuse of discretion is found, the conviction must stand unless the court finds the error to be harmful. *See **id***. Applying those standards, we find no reversible error on the basis of McCullough's testimony that he sold drugs with defendant Washington.

Defense counsel was given significant latitude to explore the terms of McCullough's plea bargain on cross-examination. The prosecutor responded on redirect by likewise raising the terms of the plea bargain. In the context of those questions, the prosecutor asked McCullough whether his guilty plea to the drug conspiracy charged in count 1 constituted an admission that he sold drugs with various defendants, including defendant Washington. McCullough's response was therefore tied to the time frame of and related to the alleged conspiracy, and we decline to reverse Washington's convictions on this ground.

## V. SENTENCING ISSUES

Defendants Reliford and Clinton challenge certain aspects of the district court's calculation of their guideline sentences. We review the trial court's application of the Sentencing Guidelines de novo and its factual findings for clear error. *See **United States v. Dixon***, 132 F.3d 192, 201 (5th Cir. 1997).

## A.    Defendant Reliford

Defendant Reliford maintains that the district court erroneously calculated the quantity of drugs attributable to him. Specifically, Reliford maintains that there is no credible evidence that he was involved in the conspiracy past November 1, 1994. Thus, Reliford maintains that he should have been held accountable for only 87.27 grams, the amount attributed to transactions occurring between September 22, 1994, and November 1, 1994, and not for additional quantities attributable to transactions occurring between November 1, 1994, and May 1997. We review the district court's factual determination of the amount fairly attributed to defendant Reliford for clear error. *See **Millsaps***, 157 F.3d at 995.

The district court's fact finding that defendant Reliford could be held accountable for transactions occurring after November 1, 1994, was based upon Officer Tong's testimony at the sentencing hearing and defendant Reliford's own statements to the probation officer that he bought and sold drugs throughout the time period defining the conspiracy. Officer Tong testified that pleading co-conspirator McCullough, informant Sellers, and witness Demarcus June told him that defendant Reliford was involved throughout the time period alleged in the indictment. Tong specifically testified concerning government information that, during the time period defined in the indictment, Reliford met people at the entrance to the Hole, ascertained what they wanted to purchase, directed the potential customers to the appropriate person and location, and sometimes involved himself in the transactions. Reliford argues

**46**

that Officer Tong's testimony is inadmissible hearsay and that it is incredible because it is inconsistent with those witnesses' trial testimony that they never purchased drugs from defendant Reliford.

We disagree. Defendant Reliford's objection that Officer Tong's sentencing testimony was inadmissible hearsay is unavailing. The evidence used to determine relevant conduct for sentencing purposes need not be admissible at trial, but needs only to possess sufficient indicia of reliability to support its accuracy. *See Medina*, 161 F.3d at 876. We likewise disagree with defendant Reliford's premise that Officer Tong's sentencing testimony was patently inconsistent with the testimony of Sellers, McCullough, and Demarcus June at trial. While it is true that those witnesses testified that they did not personally buy drugs from defendant Reliford, that testimony is not necessarily inconsistent with what Officer Tong said he learned about defendant Reliford's role from those witnesses. Indeed, McCullough testified consistently at trial that he knew each of the defendants and that they were all involved in the conspiracy. McCullough also testified that he observed defendant Reliford directing traffic at the Hole some time after 1993. Moreover, the district court, which presided over the trial of this matter as well as the sentencing, was competent to assess the demeanor and credibility of the witnesses at trial and the evidence offered at sentencing. *See Sotelo*, 97 F.3d at 799. The district court's resolution of whatever factual ambiguities may appear in the record are deserving of our deference, provided there

**47**

is a plausible basis in the record for the district court's determination. *See **United States v. Lage***, 183 F.3d 374, 383 (5th Cir. 1999), *cert. denied*, 120 S. Ct. 1179 (2000). With due consideration of both Officer Tong's testimony at sentencing and the witnesses' testimony at trial, we can not conclude that the district court's factual determinations that Reliford continued to participate in the conspiracy and that the quantities involved in the transactions occurring after November 1, 1994 were reasonably foreseeable to him are implausible. *See* U.S.S.G. § 1B1.3(a)(1)(B) (permitting consideration of "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity"); *see also **United States v. Brito***, 136 F.3d 397, 415 (5th Cir.), *cert. denied*, 118 S. Ct. 1817 (1998).

Defendant Reliford also objects to the district court's reliance upon Reliford's admission to the probation officer that he purchased and sold drugs daily until his April 27, 1998 arrest. Reliford maintains that the probation officer's conclusory hearsay statement, standing alone, is an inadequate factual basis for the court's inclusion of transactions after November 1, 1994, because the statement does not tie the subject drug trafficking activities to the activities of the conspiracy. We need not decide whether Reliford's admission, standing alone, would suffice. The record presents an ample factual basis for the district court's factual determination of the quantity attributable under the guidelines to defendant Reliford. We therefore reject defendant Reliford's argument that the district court's decision to hold him responsible

**48**

for drugs distributed after November 1, 1994, was clearly erroneous.

**B.    Defendant Clinton**

Defendant Clinton contends that the district court clearly erred by enhancing his sentence under U.S.S.G. § 2D1.1(b) for possession of a dangerous weapon.  The district court's factual determination that Clinton possessed a dangerous weapon is reviewed for clear error.  *See **United States v. Navarro***, 169 F.3d 228, 234 (5th Cir.), *cert. denied sub nom.*, ***Edmonson v. United States***, 120 S. Ct. 117 (1999); ***United States v. Chavez***, 119 F.3d 342, 348 (5th Cir.) (district court's determination that a co-conspirator's possession of a firearm was reasonably foreseeable is reviewed for clear error), *cert. denied*, 118 S. Ct. 615 (1997).  Clinton's briefing suggests that the district court's application of the enhancement defined in § 2D1.1(b) was premised solely upon the fact that police found guns at his home when he was arrested in December 1997, six months after the conspiracy alleged in count 1 ended.

We disagree.  The presentence report describes several occasions on which Clinton was in actual possession of firearms during the course of the conspiracy.  For example, in November 1994, Clinton's car was stopped and police recovered a 9 mm Cobray handgun with one clip and 31 rounds of live ammunition.  In January 1995, Clinton was detained after police recovered a 9 mm semi-automatic handgun with a magazine containing 11 rounds of live ammunition when investigating a report of loud music at an apartment complex.  Finally, in November 1996, police recovered two

weapons owned by Clinton, a Norinco semi-automatic assault rifle, Model SKS, and a Remington semi-automatic rifle, Model 66, after an attempted robbery and shooting incident at Clinton's house. While there is no direct evidence tying Clinton's possession of these weapons to his drug trafficking activities, there is circumstantial evidence supporting the inference that there was such a connection. We therefore conclude that the facts relating to Clinton's individual possession of dangerous firearms on multiple occasions during the time period defined in the indictment provides some factual support for the district court's application of § 2D1.1(b)(1).

Of equal importance, defendant Clinton may be held responsible, not only for his own conduct, but for the foreseeable conduct of his co-conspirators. The record establishes that McCullough, who pleaded guilty to the conspiracy count, carried guns provided by defendant Clark to protect the drug trafficking activities made the object of the conspiracy. A co-conspirator's possession of a firearm may be used to enhance a sentence if that possession is reasonably foreseeable to the defendant. *See United States v. Garza*, 118 F.3d 278, 286 (5th Cir. 1997); *see also United States v. Gaytan*, 74 F.3d 545, 559 (5th Cir. 1996) ("A court may ordinarily infer that a defendant should have foreseen a codefendant's possession of a dangerous weapon, such as a firearm, if the government demonstrates that another participant knowingly possessed a weapon while he and the defendant committed the offense."). Given the evidence presented at trial, and the

foregoing factual circumstances, we have no trouble concluding that McCullough's possession of a dangerous weapon as part of his assigned duty of protecting the conspiracy was reasonably foreseeable to defendant Clinton. We, therefore, affirm the district court's reliance upon § 2D1.1(b) when determining defendant Clinton's sentence.

Defendant Clinton also maintains that the district court clearly erred by enhancing his sentence under U.S.S.G. § 3B1.1 based upon the factual determination that he was a leader, manager, or supervisor of the conspiracy. As to this enhancement, Clinton contends that the district court failed to make the findings required by Federal Rule of Criminal Procedure 32(c) to support application of this enhancement. Clinton also maintains that there is an insufficient factual basis for the district court's factual determination that he played a leadership role in the conspiracy. The district court's implementation of Federal Rule of Criminal Procedure 32(c) is reviewed de novo. *See* ***United States v. Myers***, 150 F.3d 459, 461 (5th Cir. 1998). The district court's determination that defendant Clinton played a leadership role is a factual determination, which we review for clear error. *See* ***Navarro***, 169 F.3d at 234.

The district court relied upon the relevant sentencing documents, overruling Clinton's objection to the enhancement for a leadership role "for the reasons stated" therein. The district court's express adoption of those reasons supporting the enhancement that were given in the sentencing documents was in this

case sufficient to satisfy its obligations under Federal Rule of Criminal Procedure 32(c).  *See* **United States v. Duncan**, 191 F.3d 569, 575 (5th Cir. 1999) ("We have nevertheless rejected the proposition that a court must make a catechismic regurgitation of each fact determined; instead, we have allowed the district court to make implicit findings by adopting the PSR.").  While the relevant paragraph in the presentence report merely referred to record evidence establishing defendant Clinton's role in the conspiracy, the government's response to Clinton's objections actually set forth the record evidence supporting the probation officer's conclusion that the enhancement was appropriate. Specifically, informant Sellers testified that defendant Clark was a leader in the conspiracy and that defendant Clinton "played the same role" as defendant Clark.  The record reflects that informant Sellers further testified that defendants Reliford and Washington played the lesser role of distributor, rather than leader or manager of the conspiracy.  The government maintains that defendant Clinton also demonstrated control over the conspiracy by approaching Officer Washington after an undercover buy and telling Officer Washington that the officer would be "dealing with" Clinton from now on.  While there is evidence in the record that might implicitly support an inference of a lesser role for defendant Clinton, the record reflects an adequate evidentiary basis for the district court's factual determination that defendant Clinton played a leadership role.  We therefore conclude that the district

court's fact finding that defendant Clinton played a leadership role is not clearly erroneous.

## CONCLUSION

For the foregoing reasons, the criminal convictions and sentences of defendants Clark, Clinton and Reliford are AFFIRMED. The criminal convictions and sentences of defendant Washington as to the conspiracy count (count 1), and as to the counts alleging distribution of crack cocaine on September 28, 1994 (count 3), October 5, 1994 (count 4), October 21, 1994 (count 5), November 1, 1994 (count 6), January 24, 1995 (count 7), January 27, 1995 (count 8), and January 31, 1995 (count 9), are AFFIRMED. The criminal conviction and sentence of defendant Washington as to the count alleging attempted distribution of crack cocaine on March 10, 1995 (count 10), is REVERSED, and the cause is REMANDED for entry of a modified judgment consistent with this opinion.