IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-40247
_____


UNITED STATES OF AMERICA,

              Plaintiff-Appellee

-vs-


JOHNIE WISE AND JACK ABBOTT GREBE, JR.,

              Defendants-Appellants


_____

Appeals from the United States District Court
Southern District of Texas

_____

July 31, 2000

Before WIENER and STEWART, Circuit Judges, and LITTLE, District Judge.[*]


LITTLE, District Judge:

    Defendants-appellants Johnie Wise ("Wise") and Jack Abbott Grebe, Jr. ("Grebe") appeal the judgment of criminal conviction entered on 5 February 1999, in the United States

_____

[*] Chief Judge of the Western District of Louisiana, sitting by designation.

1

District Court for the Southern District of Texas, Brownsville Division. Appellants argue that a number of errors occurred with regard to the trial, as a result of which this Court should find the evidence insufficient to sustain their conviction or, alternatively, reverse and remand for a new trial. We AFFIRM the judgment and the district court in all respects.

## I. BACKGROUND

### A. Facts of the Case

In March 1998, while shopping at a store in Harlingen, Texas called the "Bargain Barn," John Cain ("Cain"), a self-employed computer consultant, met owner John Roberts ("Roberts") and employee Oliver Dean Emigh ("Emigh"). During the course of conversation, Roberts told Cain that he was a member of the Republic of Texas[1] ("ROT") and often needed documents typed for ROT legal matters. Cain offered his assistance and returned to the Bargain Barn the next day to discuss computer-related topics with Roberts. Cain briefly met Johnie Wise, another ROT member, during the meeting.

Cain started working for Roberts on a daily basis but was concerned about Roberts' ROT affiliation. On 10 March 1998,

---

[1]The Republic of Texas is an organization that is dedicated to removing all federal government operations from the State of Texas and re-establishing Texas as an independent nation.

Cain communicated with the Federal Bureau of Investigation (FBI) in Brownsville. Cain recited the facts of meeting Roberts, including Roberts' request for secretarial assistance on ROT matters. The FBI detected no illegal activity based on what Cain told them. The information supplied by Cain was consistent with what the FBI already generally knew about ROT, and the FBI simply documented what Cain said. Cain was told that he could notify FBI Agent David Church ("Agent Church") if he had more information to relay.

One of the tasks that Roberts asked Cain to perform was to run checks for outstanding warrants against ROT members. Cain approached the FBI again on 17 March 1998, at which time Agent Church advised Cain that running warrant checks was illegal and that Cain should inform Roberts of the same.[2] Cain also told the FBI that Roberts had invited him to attend the ROT meetings. Agent Church told Cain that whether or not to attend was entirely Cain's decision. Cain chose to attend the meetings, at one of which Cain met Jack Abbott Grebe, Jr. Grebe visited Cain's residence regularly to make photocopies, and Wise began accompanying Grebe on the visits. During that time, Cain had no communication with the FBI.

On 24 March 1998, Cain met with Agent Church again and

---

[2]When Cain told Roberts that running warrant checks was illegal, the latter's response allegedly was that he did not care.

shared what had been discussed during and after a local ROT meeting. Some of the topics that had been discussed were "shopping out"[3] and obtaining information regarding explosives from the internet.[4] When Cain stated his belief that Roberts was trying to recruit him as a ROT member, Agent Church replied that whether or not to join was Cain's decision alone. According to the FBI, they did not recruit Cain as a confidential government informer at that time but did offer, without any solicitation, to reimburse Cain for his travel expenses.

Cain next met with Agent Church on 1 April 1998 and related more information about ROT discussions. Agent Church reimbursed Cain $235 for his travel expenses and gave the latter an unsolicited $200 for lost earnings as a result of Cain's attendance at the meetings. Agent Church advised Cain that certain activities discussed at the ROT meetings may be violations of state or local law but that as of yet nothing appeared to constitute a federal offense.

On 29 April 1998, Cain met again with Agent Church to

[3]When "shopping out," ROT would file claims against the local, state, and federal governments. If the claims were not resolved to ROT's satisfaction, it would obtain favorable judgments from a ROT "common law court" and have those judgments satisfied from the payment of international debt owed to the federal government.

[4]During dinner after the meeting, Cain mentioned to Roberts and his wife that it was easy to obtain information about explosives and bombs off the internet. Roberts' wife responded by talking about how easy it was to make bombs from everyday household items. The FBI told Cain that such general discussion about bombs was not illegal but that the FBI would be interested in hearing whatever specific information Cain received.

4

tell the latter that Wise and Grebe had gone to Cain's residence the day before and had asked Cain to find the e-mail addresses of various government agencies, namely the Internal Revenue Service (IRS), the Drug Enforcement Administration (DEA), the Central Intelligence Agency (CIA), the FBI, the White House, the United States Attorney General, the Texas Attorney General, and the Texas Department of Public Safety. According to Cain, Wise and Grebe wanted to send threatening messages to the agencies and their employees if the demands of the ROT were not met. Wise discussed the idea of using pathogenic agents for diseases. Wise briefly described to Cain his proposal to convert an everyday Bic® lighter into a dart gun device from which a cactus thorn coated with some type of slow-acting poison or biological agent could be shot at unsuspecting persons. Agent Church told Cain that it was not against the law to voice one's thoughts in such a manner. But he also told Cain to listen carefully to what Wise and Grebe say when they next call him and to ask specific questions, if Cain was comfortable doing so, regarding the proposed dart gun device.

Moreover, Cain told Agent Church that Wise and Grebe had asked Cain if it was possible to do things on the internet anonymously, without leaving a trace. Cain told them that it was in fact possible through an internet service called

5

"Anonymizer," and he showed them the website on his computer.

Cain eventually accepted the position of "Undersecretary of Trade and Commerce" for ROT. Between the April 29 meeting and Cain's next meeting with Agent Church on 20 May 1998, Wise and Grebe shared with Cain their angry sentiment that the "change in power" (referring to the re-establishment of Texas as a Republic, with its own government) was taking too long. They proposed having Emigh draft a letter to send out to the various government agencies previously mentioned. Not long thereafter, Wise and Grebe gave Cain a handwritten letter that laid out their plan, specifically targeting the IRS and the DEA. Wise and Grebe made some changes to that letter, and Cain typed the letter into the computer at their instruction.

On 20 May 1998, Cain met with Agent Church to describe the plan in greater detail and to deliver a copy of the letter. Agent Church told Cain that the FBI was interested in any information Cain received and that Agent Church was recommending the opening of an FBI investigation. Furthermore, he told Cain to get detailed information regarding the plan if Cain met again with Wise and Grebe.

A few days later, Wise gave Cain a third and final draft of the letter, titled "Declaration of War." Grebe was present and participated in making the changes. Cain typed the letter into the computer as instructed, printed several copies of the

6

document, and saved it on a computer disk. Wise and Grebe asked Cain to find the e-mail addresses of the select government agencies and to send the letter anonymously via e-mail such that it would not be traced back to his computer. They discussed the idea of using a computer terminal at the Brownsville public library and transmitting the letter through the Anonymizer website so that if it were traced somehow, it would be traced to the library rather than to Cain.

Grebe later handed Cain another typed document, a follow-up letter to the first that was to be sent if the response to the first letter was deemed unsatisfactory.[5] If the response to the second letter in turn were deemed unsatisfactory, then the next step in the plan was to act upon the threat by actually infecting people with a biological agent. According to the plan, Wise was to procure the biological agent and to build the delivery device. Wise discussed the possibility of using such agents as botulism, rabies, and anthrax. According to Cain, Wise and Grebe urged Cain to send the Declaration of War e-mail because they thought he was taking too long to do

---

[5]The second letter reads:

Dear Mr. Rossotti,

Your IRS employees and their families have been targeted for destruction by revenge. These people are extremely mad and will not accept the inequities any longer. Non-traceable, personal delivery systems have been developed to inject bacteria and/or viruses for the purpose of killing, maiming, and causing great suffering. Warn all concerned so that they may protect themselves and be made aware of this threat to themselves and their families. Good luck!

so.

On 1 June 1998, Cain handed over to the FBI, who by now had opened an official investigation, a copy of the final draft of the Declaration of War and a copy of the Rossotti letter. Agent Church told Cain not to e-mail anything until he received proper approval. He again told Cain that the latter should obtain as much specific information as possible and notify the FBI if anything of an emergency nature arose.

The case became assigned to FBI Agent Franklin Sharkey ("Agent Sharkey"). Cain consented to Agent Sharkey's request to record their conversations. Subsequently, the FBI set up electronic surveillance and authorized Cain to send e-mails in an undercover investigation. The FBI rejected Cain's idea of using a public library computer and suggested instead that Cain use his home computer. On 11 June 1998, Cain called Wise and Grebe to tell them he was ready. They set the date and time for sending the Declaration of War for the following evening.

Grebe arrived at Cain's residence on 12 June 1998, and as planned, the Declaration of War was sent via e-mail to the United States Department of Justice, the DEA, the United States Treasury, the FBI, the United States Customs, and the

8

Bureau of Alcohol, Tobacco, and Firearms.[6]  Cain called Wise to tell him that the Declaration of War had been sent.  A tape recording of their conversation indicates that Wise was aware that the e-mails would be sent and was abreast of the situation overall.

After the first set of e-mails were sent, Cain continued to meet with Wise and Grebe.[7]  Grebe raised the notion of taking the next step, namely sending the follow-up letter to the Declaration of War.  Moreover, both Wise and Grebe discussed who should be the first targeted victim, and they chose a Texas state judge whom Roberts purportedly disliked because she had not allowed ROT members to defend themselves pro se in her Texas state court.[8]  They planned to stalk her, learn her movements, and attack at the right moment.  Wise suggested the use of rabies or botulism toxins for the delivery device and discussed ways to make botulism.  Wise told the others that he already had purchased the parts to convert the Bic® lighters into delivery devices.  After that meeting, Cain immediately called Agent Sharkey, who in turn advised Cain that the situation had become more serious now

---

[6]Grebe designated the government agencies to receive the Declaration of War e-mail.

[7]At this time, Cain became a paid government informer.  Cain committed to testifying against Appellants and requested FBI witness protection.

[8]Wise and Grebe also chose as initial victims the family members of IRS employees.

that a particular person was targeted.

On 26 June 1998, Wise and Grebe progressed to the second step in their plan, that is, to send out the follow-up letter. Cain typed the Rossotti letter, provided by Grebe, into his home computer in Grebe's presence and left blanks for the names and e-mail addresses of the intended recipients. The event was captured on a videotape. Wise arrived and reviewed the letter as well as the changes that Grebe had suggested. Grebe proposed, and Wise agreed, that they send the e-mail first to Rossotti, Commissioner of the IRS. Wise and Grebe told Cain the order in which to send the e-mails and spelled out the names of the recipients for Cain to enter into the computer.[9] After the second set of e-mails were sent, Wise told the others that he thought he could have the delivery device ready on the following week and again discussed targeting the Texas state judge.

After retrieving the videotape of the event, the FBI downloaded the e-mail threats onto a hard disk and printed out the mailing confirmations. Subsequently, the FBI recorded conversations with Emigh and obtained arrest and search warrants. Wise, Grebe, and Emigh were arrested on 1 July 1998. In an interview after his arrest, Emigh admitted that

---

[9]The e-mails in fact were received by the intended recipients, as proved by the government during trial.

10

he had written the first draft of the Declaration of War. Grebe denied ever having written or sent a threatening note or having engaged in any discussion regarding biological weapons. Grebe later modified his answer by stating that he had been present when the e-mails were sent but that he had been in the room at the time merely for the purpose of using the photocopier. Wise also denied having any knowledge regarding the matter or having engaged in discussions of threats with anyone.

Appellants' residences were searched by a team of federal and local agents. They found some dangerous chemicals at Wise's residence but no biological agents of the type that Wise had discussed. In addition, in Wise's living room were discovered reading materials dealing with meats and chemicals, as well as biomedical catalogues. No hazardous materials were found in Grebe's or Emigh's residence.

## B. Procedural History

On 4 August 1998, by superseding indictment Wise, Grebe, and Emigh were charged with conspiracy to use or attempt to use a weapon of mass destruction in violation of 18 U.S.C. §§ 2332a(a)(2) and (c)(2)(C) (Count 1), and with threatening to use a weapon of mass destruction in violation of 18 U.S.C. §§ 2332a(a)(2) and (c)(2)(C), and 18 U.S.C. § 2 (Counts 2 through

11

8). Wise and Grebe were convicted by a jury on Counts 5 and 6, but acquitted on the remaining counts. Emigh was acquitted on all counts. Both Wise and Grebe were sentenced to concurrent 292-month prison terms, five years of supervised release, and an aggregate $200 special assessment.

## II. DISCUSSION

### A. Applicable Standards of Review

We review a challenge to the sufficiency of the indictment, as well as a district court's denial of a motion for judgment of acquittal, de novo. See United States v. Richards, 204 F.3d 177, 191 (5th Cir. 2000); United States v. Burns, 162 F.3d 840, 847 (5th Cir. 1998). A claim that the evidence is insufficient to support a conviction is reviewed in the light most favorable to the verdict, accepting all credibility choices and reasonable inferences made by the jury. See United States v. Lage, 183 F.3d 374, 382 (5th Cir. 1999), cert. denied, --- U.S. ----, 120 S. Ct. 1179, 145 L. Ed. 2d 1086 (2000). This Court must uphold the conviction if a rational jury could have found that the government proved the essential elements of the crime charged beyond a reasonable doubt. See id. Such standard of review is the same regardless of whether the evidence is direct or circumstantial. See id.

The standard of review applied to a defendant's claim that a jury instruction was inappropriate is "whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of the law applicable to the factual issues confronting them." See United States v. Sharpe, 193 F.3d 852, 871 (5th Cir. 1999)(quoting United States v. August, 835 F.2d 76, 77 (5th Cir. 1987)), cert. denied, --- U.S. ----, 120 S. Ct. 1202, 145 L. Ed. 2d 1105 (2000). In determining whether the evidence reasonably supports the jury charge, this Court views the evidence and all reasonable inferences that may be drawn therefrom in the light most favorable to the government. See id.

With regard to prosecutorial misconduct, criminal defendants bear a substantial burden when they attempt to show that prosecutorial misconduct constitutes reversible error. See United States v. Wyly, 193 F.3d 289, 298 (5th Cir. 1999). "'A conviction should not be set aside if the prosecutor's conduct . . . did not in fact contribute to the guilty verdict and was, therefore legally harmless.'" Id. (quoting United States v. Johnston, 127 F.3d 380, 390 (5th Cir. 1997), cert. denied, 522 U.S. 1152, 118 S. Ct. 1173, 140 L. Ed. 2d 183 (1998). Finally, the proper standard for reviewing a district court's admission or exclusion of expert testimony is abuse of

discretion. See General Electric Co. v. Joiner, 522 U.S. 136, 143, 118 S. Ct. 512, 517, 139 L. Ed. 2d 508 (1997); Moore v. Ashland Chemical Inc., 151 F.3d 269, 274 (5th Cir. 1998).

## B. Issues on Appeal

### 1. "Without Lawful Authority" Provision

Appellants first argue that the evidence was insufficient to sustain their conviction because the charges failed to include the phrase "without lawful authority," which Appellants allege is an essential element of an offense under 18 U.S.C. § 2332a. On the other hand, the government argues that the indictment sufficiently alleged the elements of 18 U.S.C. § 2332a in charging that Appellants knowingly and intentionally threatened to use a weapon of mass destruction, in violation of 18 U.S.C. §§ 2332a(a)(2) and (c)(2)(C), and 18 U.S.C. § 2. According to the government, the "without lawful authority" provision is not an essential element of the offense but rather an affirmative defense, the burden of which was on the defendants to prove. This matter presents an issue of first impression, as we are asked to interpret the language of 18 U.S.C. § 2332a.

Section 2332a, enacted in 1994,[10] is a relatively new statute with little legislative history or established case

---

[10]Section 2332a was enacted under the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 60023(a), 108 Stat. 1980 (1994).

14

law.  In 1996, Congress amended the statute in connection with the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA").  The amendment, among other things, substituted the words "without lawful authority, uses, threatens, or attempts" in lieu of "uses, or attempts."  No case thus far has addressed the issue of whether the phrase "without lawful authority" is an element of a § 2332a offense or an affirmative defense thereto, and no case discusses the present version of the statute in the context of threatened use of a biological agent.

Section 2332a arguably was intended to supplement 18 U.S.C. § 175, also known as the Biological Weapons Anti-Terrorism Act of 1989.  Section 175(a) prohibits the development, production, stockpiling, transfer, acquisition, retention, or possession of any biological agent, toxin, or delivery system for use as a weapon.  See 18 U.S.C. § 175(a). The "Biological Weapons Convention of 1972," in which the United States took part, preserved the right of the participating nations to develop biological agents for legitimate research and peaceful purposes.  Congress exercised such right by creating an exception under 18 U.S.C. § 175(b) for the "development, production, transfer, acquisition, retention, or possession of any biological agent, toxin, or

15

delivery system for prophylactic, protective, or other peaceful purposes." It is a "well-established rule of criminal statutory construction that an exception set forth in a distinct clause or provision should be construed as an affirmative defense and not as an essential element of the crime." United States v. Santos-Riviera, 183 F.3d 367, 370-71 (5th Cir.), cert. denied, --- U.S. ----, 120 S. Ct. 597, 145 L. Ed. 2d 496 (1999). The exception provided in subsection (b) of 18 U.S.C. § 175, therefore, is not an essential element but rather an affirmative defense for which the defendants bear the burden of proof. Accord id. at 370; United States v. Green, 962 F.2d 938, 941 (9th Cir. 1992)("a defendant who relies upon an exception to a statute made by a proviso or distinct clause, whether in the same section of the statute or elsewhere, has the burden of establishing and showing that he comes within the exception").

Arguably, the inclusion of the phrase "without lawful authority" in the amendment to § 2332a serves the same purpose of preserving the exception that was recognized by the Convention. In § 511(a) of AEDPA, Congress made explicit findings that certain biological agents pose a severe threat to public health and safety, that such agents can be used as weapons for criminal purposes, that regulation of such agents is necessary to protect public health and safety, and that

16

"efforts to protect the public from exposure to such agents should ensure that individuals and groups with legitimate objectives continue to have access to such agents for clinical and research purposes." H.R. CONF. REP. NO. 104-518 (1996). It would be fair to say, then, that the inclusion of the phrase "without lawful authority" in § 2332a to modify the term "person" was intended to except persons who are authorized by the appropriate authorities to use hazardous biological agents for legitimate purposes.

In fact, Congress made that very point in its discussion of 18 U.S.C. § 831, a parallel statute which punishes anyone who, "without lawful authority," intentionally receives, possesses, uses, transfers, alters, disposes of, or disperses any nuclear material and thereby knowingly causes the death of or serious bodily injury to any person or substantial damage to property, or knows that circumstances exist which are likely to cause such a result. See 18 U.S.C. § 831(a)(1). The legislative history of this statute explains the phrase "without lawful authority" to except from criminal prosecution those persons whose conduct falls within the scope of their employment. See H.R. REP. NO. 97-624 (1982).

Furthermore, it is arguable that the phrase "without lawful authority" in § 2332a is similar in effect to the "except as authorized" phrase found in the Title 21 drug

17

statutes. Under 21 U.S.C. § 841(a), distribution of a controlled substance is made illegal unless the person is authorized by the statute to distribute; the burden is on the defendant to prove that he falls within an excepted category of persons. See United States v. Miranda, 494 F.2d 783, 786 (5th Cir.), cert. denied, 419 U.S. 966, 95 S. Ct. 228, 42 L. Ed. 2d 181 (1974). This Court in Miranda made an instructive distinction between that case and United States v. Leigh, 487 F.2d 206 (5th Cir. 1973):

> Miranda's situation is different from the indicted defendant in United States v. Leigh. In Leigh, the indictment described the defendant as a medical doctor (M.D.) . . . . By identifying Leigh as a medical doctor, the indictment placed him within a class of persons who are registered to dispense controlled substances as a matter of right. . . . Thus as shown in the indictment, the defendant was a person who could lawfully distribute. The indictment was dismissed because it did not allege that the act of distribution was unlawful. Miranda, however, does not fall within one of the registered or exempted categories of people and there is nothing in the indictment which raises this possibility. The distribution of heroin by Miranda as alleged in the indictment could not be lawful.

Miranda, 494 F.2d at 786 (citations omitted). Likewise, in the instant case the indictment was sufficient even without the phrase "without lawful authority." Wise and Grebe are not persons who lawfully could threaten to use a weapon of mass destruction, ever. Put another way, Appellants are not persons who would ever have lawful authority to threaten to

18

use a weapon of mass destruction. The reason is that there is no instance wherein such a threat by a private citizen, acting for himself, would be lawful. There is merit to the government's argument, then, that "it is inconceivable and defies common logic that Congress intended to require the United States to prove a person is unauthorized to *threaten* (which was defined under the charge as 'a serious statement expressing an intent to injure any person . . .') to use weapons of mass destruction." (Appellee's Br. at 48) (emphasis in original). Moreover, the threatened use of hazardous biological agents would violate the Biological Weapons Convention of 1972, the very agreement that the statute was designed to implement. This Court need not apply technical rules of statutory construction to achieve an unintended result. See United States v. Wallington, 889 F.2d 573, 576-77 (5th Cir. 1989)(observing the Supreme Court's instruction that "looking beyond the naked text for guidance is perfectly proper when the result it apparently decrees is difficult to fathom or where it seems inconsistent with Congress' intention, since the plain-meaning rule is rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists" (internal quotations omitted)). The phrase "without lawful authority" in § 2332a is an exception that modifies the term "person"; as

19

such, it constitutes an affirmative defense rather than an essential element.  Accordingly, this Court agrees with the district court that the indictment in this case sufficiently alleged the elements of an offense under 18 U.S.C. § 2332a without inclusion of the phrase "without lawful authority."

### 2.  Aiding and Abetting Government Agent

Second, Appellants contend that the evidence was insufficient to sustain the jury's verdict as to counts five and six of the indictment because Appellants had not acted "without lawful authority."  Their argument is as follows: (1) Cain, who was acting for the government, was authorized by the FBI to send the e-mails and, thus, his actions were lawful; (2) since the actions of Cain, as the principal, were lawful, the actions of Appellants, as aiders and abetters, also were lawful; (3) Appellants, therefore, did not act "without lawful authority," as Section 2332a(a) would require; (4) since Section 2332a(a) was not violated, the jury's verdict, finding Appellants guilty as to counts five and six, was erroneous.

Appellants appear to confuse aiding and abetting with conspiracy.  There is a distinction between the two theories. As this Court explained in United States v. Bright, 630 F.2d 804 (5th Cir. 1980):

> The essence of conspiracy is proof of a conspiratorial agreement while aiding and abetting requires there be a "community of unlawful intent"

> between the aider and abettor and the principal. While a community of unlawful intent is similar to an agreement, it is not the same. Thus a defendant may wittingly aid a criminal act and be liable as an aider and abettor, but not be liable for conspiracy, which requires knowledge of and voluntary participation in an agreement to do an illegal act. "As a matter of law, aiding and abetting the commission of a crime and conspiracy to commit that crime are separate and distinct offenses."

Id. at 813 (citations omitted). Wise and Grebe were acquitted on the conspiracy count (Count 1), but were convicted on two counts of knowingly and intentionally threatening to use a weapon of mass destruction, in violation of 18 U.S.C. §§ 2332a(a)(2) and (c)(2)(C), and 18 U.S.C. § 2. Section 2 provides:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2.

Under Fifth Circuit jurisprudence, an aiding and abetting conviction for a completed substantive offense may stand even if the principal is a government agent with no guilty intent and therefore no substantive crime actually was committed.[11]

_____

[11]Accord United States v. Meinster, 619 F.2d 1041, 1046 (4th Cir. 1980)(upholding conviction for aiding and abetting drug smuggling and rejecting appellants' claim that "the absence of a guilty principal precludes their conviction on aiding and abetting charges"); United States v. Gould, 419 F.2d 825, 826 (9th Cir. 1969)(per curiam)(upholding conviction for aiding and abetting smuggling of marijuana even though there was no "guilty principal" because drugs actually were "smuggled" over the border by government informant). But see United States v. Washington, 106 F.3d 983, 1003-04 (D.C. Cir.)(there must be

21

See United States v. Moreno, 878 F.2d 817, 821 (5th Cir.)(rejecting argument that defendant committed no crime since she aided and abetted informant acting for government), cert. denied, 493 U.S. 979, 110 S. Ct. 508, 107 L. Ed. 2d 510 (1989); Haynes v. United States, 319 F.2d 620, 621-22 (5th Cir. 1963)(defendant who arranged drug smuggling by informant could be convicted for importing that substance even though informant was government agent).  Wise and Grebe, therefore, may be found guilty of aiding and abetting a crime even if Cain's actions were authorized by the government, and their argument to the contrary is without merit.[12]  The fact that Cain's actions were authorized does not mean necessarily that Wise and Grebe could not have acted "without lawful authority" because they were in the same venture.  Appellants' argument, therefore, fails.

### 3. Interstate Commerce Element

The third issue raised is whether the district court abused its discretion in refusing to charge the jury that the offense must have "substantially affected" interstate commerce.  The district court gave the following jury instruction, in relevant part:

---

guilty principal before there can be aider and abettor, and accomplice and principal must have "shared intent"),cert. denied, 522 U.S. 984, 118 S. Ct. 446, 139 L. Ed. 2d 382 (1997).

[12]Moreover, one could argue that Wise and Grebe were each a principal in this case and that they aided and abetted one another in the commission of the crime under 18 U.S.C. §§ 2332a(a)(2) and (c)(2)(C), in violation of 18 U.S.C. §2.

> Title 18, United States Code, Section 2332a makes it a crime for anyone to threaten to use a weapon of mass destruction against any person within the United States and results of such use would have affected interstate or foreign commerce.
>
> For you to find the Defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:
>
> *First*: That the defendant intentionally and knowingly threatened to use a weapon or weapons of mass destruction;
>
> *Second*: That the weapon or weapons of mass destruction were threatened to be used against persons within the United States as specifically alleged in Counts 2-8;
>
> *Third*: That the results of such use would have affected interstate or foreign commerce.

(18 R., Attach. at 29-30.) In essence, Appellants argue that the district court erred in refusing to instruct the jury that a violation of 18 U.S.C. § 2332a(a) requires a finding by them of a substantial effect on interstate commerce.

Section 2332a(a) provides in relevant part:

> A person who, without lawful authority, uses, threatens, or attempts or conspires to use, a weapon of mass destruction . . . , including any biological agent, toxin, or vector (as those terms are defined in section 178) . . . against any person within the United States, and the results of such use affect interstate or foreign commerce or, in the case of a threat, attempt, or conspiracy, would have affected interstate or foreign commerce . . . shall be imprisoned for any term of years or for life . . . .

18 U.S.C. § 2332a(a)(2). Appellants were convicted on two counts of threatening to use a weapon of mass destruction, namely a biological agent and a weapon involving a disease

23

organism, against persons within the United States. The statute on its face makes clear that, in the case of a threat, it applies where the results <u>would have</u> affected interstate or foreign commerce. The jury instruction in this case tracked the language of the statute by making as an essential element the government's proof beyond a reasonable doubt that the results of use of the weapon of mass destruction would have affected interstate or foreign commerce. The statute does not require, in the case of a threat, an actual or substantial effect on commerce; it requires only a showing that the use <u>would have</u> affected commerce. <u>See</u> 18 U.S.C. § 2332a(a)(2). The jury instruction given by the court below, therefore, was proper.

In any event, the e-mails, which had been sent from Texas, were received by government agencies outside of Texas. For example, the FBI received the e-mails in California; the United States Customs received the e-mails at its website in Virginia; the ATF, the Secret Service, and the Office of Correspondence for the President all received the e-mails in Washington, D.C. The threat itself crossed state boundaries; therefore, it cannot be argued that an effect on interstate commerce is lacking in this case.

Appellants call into question the sufficiency of the evidence as to the effect on interstate commerce.

24

Specifically, Appellants allege that the government failed to present any testimony or documentary evidence that the use of the weapon specified in the threat would have affected interstate commerce. As previously discussed, the e-mails, which had been sent by Appellants from Texas, were received by government agencies outside of Texas. The threat itself, therefore, crossed state boundaries. Since the IRS and the DEA are located outside of, and received the threat letters outside of, Texas, logic dictates that had Appellants actually carried out their threat, their action would have had consequences outside of Texas, where the IRS and the DEA are located. Viewing the evidence in the light most favorable to the jury's verdict, a rational trier of fact could have found that the interstate commerce element was satisfied in this case beyond a reasonable doubt.

### 4. Improper Closing Argument

The fourth point of contention is whether the prosecutor made improper remarks during his closing argument that impermissibly affected the verdict. Appellants argue that the government committed reversible error by making a reference to the Oklahoma City bombing during closing argument, in violation of its agreement with Appellants not to make such reference. Prior to trial, Appellants had filed a motion in limine requesting that the government be precluded from making

25

any general or specific reference to the Oklahoma City bombing or other similar happening, to which motion the prosecutor agreed.

In reviewing an assertion of prosecutorial misconduct, this Court employs a two-step analysis. First, we initially must decide whether or not the prosecutor made an improper remark. See United States v. Gallardo-Trapero, 185 F.3d 307, 320 (5th Cir. 1999), cert. denied, --- U.S. ----, 120 S. Ct. 961, 145 L. Ed. 2d 834 (2000). If an improper remark was made, the second step is to evaluate whether the remark affected the substantial rights of the defendants. See id. In determining whether statements made by a prosecutor were improper, it is necessary to view them in context. See id. (citing United States v. Washington, 44 F.3d 1271, 1278 (5th Cir. 1995)). In this case, the prosecutor had agreed not to make any general or specific reference to other crimes, acts of violence, threats, attempts, or conspiracies, including the Oklahoma City bombing. During closing argument, the prosecutor argued that "John Cain doesn't like to see people get shot at schoolyards. He doesn't like to see people get bombs through the mail. He doesn't like to see federal buildings being blown up with truckloads full of manure." (18 R. at 1199-1200.) After the district court overruled Wise's objection to such statements, the prosecutor continued: "Are

26

we going to wait to see if that happens?  You think the FBI or the government, if they found out that a truckload full of manure was placed in a federal building that they would have waited to see what would happen if they knew it was going to explode[?]"  (18 R. at 1201.)  The district court overruled Grebe's objection to those statements.  Appellants are correct:  The prosecutor's remarks made a general reference to the kind of bombing that took place in Oklahoma City.  Because the prosecutor had agreed not to make such references, his statements were improper.

It is unlikely, however, that such remarks affected Appellants' substantive rights.  In determining whether the prosecutor's remarks prejudiced Appellants' substantive rights, this Court assesses "(1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the evidence of the defendant's guilt."  Gallardo-Trapero, 185 F.3d at 320 (internal quotations and citations omitted).  With regard to the first factor, "[t]he magnitude of the prejudicial effect is tested by looking at the prosecutor's remarks in the context of the trial in which they were made and attempting to elucidate their intended effect."  United States v. Fields, 72 F.3d 1200, 1207 (5th Cir.), cert. denied, 519 U.S. 807, 117 S. Ct. 48, 136 L. Ed. 2d 13 (1996).  At trial, the defense

27

attempted to impeach Cain's credibility and character. In making the remarks at issue, the prosecutor apparently was trying to rebut the defense's attack against Cain by portraying Cain as a good, responsible citizen, one who had acted out of public concern. Although that does not wholly excuse the prosecutor's violation of the agreement, given the strident advocacy on both sides of this case and the numerous pieces of evidence and issues placed before the jury, we cannot say that the prosecutor's statements overshadowed what had come before and unduly prejudiced Appellants' case. See Gallardo-Trapero, 185 F.3d at 320-21.

Second, the district court helped to mitigate any prejudicial effect of the prosecutor's remarks by instructing the jury to base their decision solely upon the testimony and evidence presented. The court charged the jury as follows:

> In [determining the facts], you must consider only the evidence presented during the trial, including the sworn testimony of the witnesses and the exhibits. Remember that any statements, objections, or arguments made by the lawyers are not evidence. . . . In the final analysis . . . it is your own recollection and interpretation of the evidence that controls the case. What the lawyers say is not binding upon you. . . . Your verdict must be based solely on the legally admissible evidence and testimony.

(18 R., Attach. at 5.) Such instructions are presumed to be followed unless an "overwhelming probability" exists that the jury will be unable to follow the instruction, and a "strong

28

probability" that the effect of the improper statements is devastating. See Gallardo-Trapero, 185 F.3d at 321 (quoting United States v. Tomblin, 46 F.3d 1369, 1390 (5th Cir. 1995)). There is no indication here that the jury was unable to follow the instruction of the court below or that the effect of the prosecutor's remarks was "devastating."

As to the third factor, the evidence of Appellants' guilt is strong, and in light of the previous analyses of Appellants' sufficiency of the evidence claims, it is reasonable to find that "the remark by the government during closing argument does not outweigh the strength of the multifaceted evidence and testimony presented during trial." Id. Viewing the prosecutor's statements in the context of the entire case, this Court concludes that the statements did not prejudice the substantive rights of Appellants.

### 5. Entrapment

The fifth issue presented on appeal is whether the district court abused its discretion in denying Appellants' motion for judgment of acquittal based on the defense of entrapment. Appellants argue that the district court erred in denying their motion because the government's actions constituted entrapment as a matter of law. We review a district court's denial of a motion for judgment of acquittal de novo. See United States v. Reliford, 210 F.3d 285, 288

29

(5th Cir. 2000). Because such a motion is in effect a challenge to the sufficiency of evidence used to convict, we view the evidence, any inferences to be drawn from the evidence, and any required credibility determinations in the light most favorable to the guilty verdict. See id. "The jury's verdict must be affirmed if 'a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.'" Id. at 288-89 (quoting United States v. Medina, 161 F.3d 867, 872 (5th Cir. 1998), cert. denied, 526 U.S. 1043, 119 S. Ct. 1344, 143 L. Ed. 2d 507 (1999)). The jury is free to choose among reasonable constructions of the evidence. See United States v. Ferguson, 211 F.3d 878, 882 (5th Cir. 2000).

The jury was given the Fifth Circuit pattern jury instruction on entrapment, which instruction was a correct statement of the law and not erroneous. See United States v. Brace, 145 F.3d 247, 263 (5th Cir.), cert. denied, 525 U.S. 973, 119 S. Ct. 426, 142 L. Ed. 2d 347 (1998); United States v. Hernandez, 92 F.3d 309, 311 (5th Cir. 1996). "When a jury, which was fully charged on entrapment, rejects the defendant's entrapment defense, the applicable standard of review is the same as that which applies to sufficiency of the evidence." United States v. Rodriquez, 43 F.3d 117, 126 (5th Cir. 1995).

Entrapment occurs "when the criminal design originates

30

with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." Sorrells v. United States, 287 U.S. 435, 442, 53 S. Ct. 210, 212-13 (1932). Entrapment is an affirmative defense with two related elements: government inducement of the crime and a lack of predisposition on the part of the defendant to engage in the criminal conduct. See Mathews v. United States, 485 U.S. 58, 63, 108 S. Ct. 883, 886 (1988). Entrapment can be disproved by proving beyond a reasonable doubt either that the defendant was not induced or that he was predisposed to commit the crime. See United States v. Thompson, 130 F.3d 676, 689 (5th Cir. 1997)(quoting United States v. El-Gawli, 837 F.2d 142, 147 (3d Cir. 1988)), cert. denied, 524 U.S. 920, 118 S. Ct. 2307, 141 L. Ed. 2d 166 (1998).

In this case, the evidence supports a finding of Appellants' predisposition to commit the crime. Predisposition focuses on whether the defendant was an "unwary innocent" or instead an "unwary criminal" who readily availed himself of the opportunity to perpetrate the crime. See Brace, 145 F.3d at 254-55 (quoting Mathews v. United States, 485 U.S. 58, 63, 108 S. Ct. 883, 886 (1988)). "The active, enthusiastic participation on the part of the defendant is

31

enough to allow the jury to find predisposition." Rodriquez, 43 F.3d at 126-27.

Wise and Grebe, on their own initiative, went to Cain's residence on 29 April 1998 and asked Cain to find the e-mail addresses of various government agencies. Apparently, the reason for Appellants' request was that they wanted to send threatening messages to the agencies and their employees. At that time, Wise discussed the idea of using diseases to threaten persons and his proposal to convert a Bic® lighter into a lethal dart gun device. Moreover, Wise and Grebe, on their own initiative, asked Cain if it would be possible to send anonymous messages through the internet, without being traced. In May 1998, Appellants gave Cain the Declaration of War document to type into the computer. Grebe also gave Cain the Rossotti letter to type. Both documents were threat letters to be sent to various government agencies specifically chosen by Wise and Grebe. As Appellants had been the ones to approach Cain, rather than vice versa, with ideas to send threat letters and even perhaps to act upon those threats, it is clear that Appellants had the predisposition to commit the crime for which they were convicted. At the very least, they actively and enthusiastically participated in the crime, which is sufficient to support a finding of predisposition. See Rodriguez, 43 F.3d at 126-27.

Even were we to assume that predisposition is lacking in this case, evidence exists to support a finding that Appellants were not induced by the government to commit the crime. Again, Wise and Grebe instructed Cain to type the documents, as well as the names and e-mail addresses of the intended recipients, into the computer and to send the letters via e-mail. In fact, according to Cain's testimony, Appellants urged him to send the e-mails right away but Cain did not because he was awaiting FBI authorization. A reasonable jury could find in this case that the government did not induce Appellants to perpetrate the crime.

Appellants argue that the district court erred in failing to instruct the jury on "predispositional entrapment," presumably referring to the issue of "positional predisposition" raised by another circuit in United States v. Hollingsworth, 27 F.3d 1196, 1200 (7th Cir. 1994), and briefly discussed by this Court in United States v. Brace, 145 F.3d 247, 255 (5th Cir. 1998). We declined to review that issue in Brace, however, because it neither had been preserved at trial nor even was presented to the panel for the first time on appeal. See Brace, 145 F.3d at 255. Appellants contend that the positional predisposition issue is squarely before this Court in this case since the issue was preserved at trial.

In Hollingsworth, the court interpreted Jacobson v.

33

United States, 503 U.S. 540, 112 S. Ct. 1535 (1992), to require evidence that the defendant was "so situated by reason of previous training or experience or occupation or acquaintances that it is likely that if the government had not induced him to commit the crime some criminal would have done so." Hollingsworth, 27 F.3d at 1200. But see United States v. Thickstun, 110 F.3d 1394, 1397-98 (9th Cir.)(rejecting the Hollingsworth "positional predisposition" standard), cert. denied, 522 U.S. 917, 118 S. Ct. 305, 139 L. Ed. 2d 235 (1997). Importantly, the Hollingsworth court acknowledged that cases in which the defendant is not in a position without the government's help to become involved in illegal activity "are rare." Hollingsworth, 27 F.3d at 1200.

Furthermore, the Hollingsworth court articulated that it "[did] not wish to be understood as holding that lack of present means to commit a crime is alone enough to establish entrapment if the government supplies the means." Id. at 1202. Cf. United States v. Bradfield, 113 F.3d 515, 522 (5th Cir. 1997)(merely affording defendant opportunity or facilities for commission of crime is insufficient to establish inducement); United States v. Jackson, 700 F.2d 181, 192 (5th Cir. 1983)(providing opportunity to commit crime does not constitute improper government inducement). The court then provided an example of a situation wherein the defendant

34

already had the idea for the crime, the government supplied the means to commit it, and the defendant, therefore, was predisposed and not entrapped.[13]  No significant distinction exists between that illustration and the facts of this case. Wise and Grebe had the idea of sending threat letters to various government agencies planned out but merely lacked the present means to send the letters via e-mail.  If Cain had not assisted them with regard thereto, someone else very well might have, as Appellants most likely would have looked elsewhere for assistance.[14]  Accordingly, contrary to what Appellants seem to believe, <u>Hollingsworth</u> does nothing to support Appellants' position.  A jury instruction regarding the issue of positional predisposition was required neither in <u>Hollingsworth</u> nor in this case.

## 6.  Spoliation

Appellants contend that spoliation of evidence is at issue in this case, and they argue that the district court

---

[13]The illustration given by the court was the following:

Suppose . . . [the defendant] had decided to smuggle arms to Cuba but didn't know where to buy a suitable boat.  On a hunch, a government agent sidles up to [the defendant] and gives him the address of a boat dealer; and [the defendant] is arrested after taking possession of the boat and setting sail, and is charged with attempted smuggling.  That would be a case in which the defendant had the idea for the crime all worked out and lacked merely the present means to commit it, and if the government had not supplied them someone else very well might have.  It would be a case in which the government had merely furnished the opportunity to commit the crime to someone already predisposed to commit it.

<u>Hollingsworth</u>, 27 F.3d at 1203.

[14]Alternatively, Appellants might have sent the letters via U.S. postal mail, for instance, which would not have changed the nature of the offense.

35

erred in denying Appellants' request for jury instruction on spoliation. They argue in their support that the government failed to comply with a discovery request for computer data; that FBI Agent Sharkey did not seize Cain's computer because he did not consider the computer itself to constitute "evidence"; and that as a result of not seizing the computer, almost everything on the hard drive was lost when Cain installed a new Windows 95 program in the computer.

An adverse inference drawn from the destruction of records is predicated on bad conduct. See Caparotta v. Entergy Corp., 168 F.3d 754, 756 (5th Cir. 1999); Vick v. Texas Employment Comm'n, 514 F.2d 734, 737 (5th Cir. 1975). Accord Eaton Corp. v. Appliance Valves Corp., 790 F.2d 874, 878 (Fed. Cir. 1986)(two conditions precedent are destruction of evidence and bad faith); Coates v. Johnson & Johnson, 756 F.2d 524, 551 (7th Cir. 1985); Valentino v. United States Postal Service, 674 F.2d 56, 73 n.31 (D.C. Cir. 1982). A district court has discretion to admit evidence of spoliation and to instruct the jury on adverse inferences. Cf. Higgins v. Martin Marietta Corp., 752 F.2d 492, 496 (10th Cir. 1985)(absent a showing of bad faith, failure to produce records is insufficient to warrant a spoliation or missing evidence instruction).

In the case before us, the government did not destroy

36

Cain's computer; in fact, the computer was not even in the government's custody. The fact is that Cain, the private owner of the computer at issue, made a personal decision to install a new program. As a result, some data in the computer vanished or became irretrievable. As there is no evidence of bad faith conduct by the government, the district court properly declined to instruct the jury on the issue of spoliation of the evidence.[15] Accord Williams v. Briggs Co., 62 F.3d 703, 708 (5th Cir. 1995)(no finding of spoliation where the evidence in issue was not destroyed or lost and plaintiff offered no evidence to suggest defendant did anything to alter the condition of the evidence in issue).

With regard to Appellants' argument that the district court's failure to give a spoliation instruction deprived them of the opportunity to attack effectively the mishandling of evidence, Appellants confuse opportunity to litigate with decision on the merits. The court below determined that an instruction on spoliation was not warranted in this case. The fact that the court so held does not mean that Appellants were denied the opportunity to present their spoliation claim. This Court finds that Wise and Grebe were not "deprived of the opportunity to effectively attack the mishandling of evidence"

---

[15]We note that the evidence at issue is Cain's computer, not the data therein that inadvertently got lost.

37

and that the district court did not abuse its discretion in declining to give a jury charge on the issue of spoliation.

**7.  Agent Decker's Expert Opinion Testimony**

Last but not least, Appellants argue that the district court abused its discretion in permitting Supervisory Special Agent R. Scott Decker ("Agent Decker") to testify as an expert during trial as to whether anthrax, rabies, HIV, and botulism constitute biological agents under the definition of 18 U.S.C. § 178.  We review a district court's decision to admit or exclude expert testimony for abuse of discretion.  See United States v. Matthews, 178 F.3d 295, 304 (5th Cir.), cert. denied, --- U.S. ----, 120 S. Ct. 359, 145 L. Ed. 2d 280 (1999).  "Even assuming that an abuse of discretion occurred, the erroneous admission of expert testimony is subject to harmless error analysis."  Id. (citing United States v. Griffith, 118 F.3d 318, 323 (5th Cir. 1997)).

Agent Decker testified that he was the Biology Program Manager in the Hazardous Materials Response Unit with the FBI. His area of investigation involved weapons of mass destruction.  His training and expertise included a Bachelor of Science in zoology from Rhode Island, a Ph.D. in human genetics from the University of Michigan, and post-graduate research on viral replication at Harvard University Medical School.  He co-authored eleven or twelve publications in the

38

areas of genetics, protein biochemistry, molecular biology, and DNA replication. During his employment with the federal government, Agent Decker worked with the Department of Defense, Navy Research Laboratory at Fort Dietrich, and he reviewed, in connection with this case, literature written by experts on the topic of biological weaponry. Clearly, Agent Decker had the qualifications to be deemed an expert on biological agents and weaponry, and it cannot be argued with any seriousness to the contrary.

Agent Decker was familiar with 18 U.S.C. § 2332a (a weapon of mass destruction includes any biological agent or toxin, as defined in § 178), and with 18 U.S.C. § 178(a) ("biological agent" includes any micro-organism, virus, or infectious substance). He testified that, in his expert opinion, botulism toxin, HIV, and rabies fell within the definition of "biological agent" under § 178, and he explained why. The testimony of Agent Decker pertained to scientific knowledge and therefore was reliable. In the end, Agent Decker's testimony passes the <u>Daubert</u> analysis, and Appellants' arguments to the contrary are meritless. The district court did not err in allowing Agent Decker to give expert opinion testimony regarding biological agents. Even were we to assume that an abuse of discretion occurred, the erroneous admission of his expert testimony would be subject

39

to harmless error analysis. Given the strength of the government's case against Appellants, the admission of Agent Decker's testimony would have constituted nothing more than harmless error. Either way then, Appellants' argument on this issue fails.

### III. CONCLUSION

The indictment sufficiently alleged the elements of an offense under 18 U.S.C. § 2332a in charging that Appellants intentionally and knowingly threatened to use a weapon of mass destruction, in violation of 18 U.S.C. §§ 2332a(a)(2) and (c)(2)(C), and 18 U.S.C. § 2. The evidence fully supports the jury's verdict as to counts five and six of the indictment. The district court did not abuse its discretion in refusing to charge the jury that the offense "substantially affected" interstate commerce. The evidence supports the jury's finding that Appellants caused a threat to use a weapon of mass destruction to be communicated. Although the prosecutor made improper remarks during his closing argument, such remarks did not substantially affect the verdict. The district court did not abuse its discretion in denying Appellants' motion for judgment of acquittal based on the defense of entrapment. The district court properly declined to instruct the jury on the issue of spoliation. And finally, the district court did not

abuse its discretion in allowing Agent Decker's expert opinion testimony.  For these reasons, we deny the relief sought by Appellants and AFFIRM the district court's ruling and judgment in all respects.


AFFIRMED